IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

Case No: 2014-32220 CA 21

PASCUAL DIAZ- PLASCENCIA,

      Plaintiff,

vs.

PUBLIC HEALTH TRUST, d/b/a
JACKSON MEMORIAL HOSPITAL and
MIAMI-DADE COUNTY, FLORIDA,
      Defendants.
_____/

### AGREED ORDER REGARDING THE FILING OF THE
### SECOND AMENDED COMPLAINT

    This cause having come before the Court on the Plaintiff's Motion for Leave to File the

Second Amended Complaint, and pursuant to Rule 1.190(a), Fla.R.Civ.P., and with the

agreement of Defendants Public Health Trust and Miami-Dade County, and the Court being

otherwise fully advised in the premises, it is hereby

    ORDERED and ADJUDGED as follows:

    1.  Plaintiff's Motion for Leave to File the Second Amended Complaint, dated June

       3, 2016, is hereby GRANTED;

    2.  Plaintiff's Second Amended Complaint, dated June 3, 2016, shall be deemed

       filed as of the date of this Order;

    3.  Defendants Public Health Trust and Miami-Dade County shall file an Answer or

       Responsive Pleading within thirty (30) days of the date of this Order; and

1

4.   Defendants Ponce, Zambrano, and Calderon shall file an Answer or Responsive

Pleading within twenty (20) days of service.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 06/13/16.

ANTONIO ARZOLA
CIRCUIT COURT JUDGE

No Further Judicial Action Required on THIS MOTION
CLERK TO RECLOSE CASE IF POST JUDGMENT

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.   The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Filing # 42328916 E-Filed 06/03/2016 05:47:58 PM

IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO: 2014-32220 CA 21

PASCUAL DIAZ PLASCENCIA,

       Plaintiff,

vs.

PUBLIC HEALTH TRUST d/b/a JACKSON MEMORIAL HOSPITAL and MIAMI-DADE COUNTY, FLORIDA,

       Defendants.

_____/

## PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

      Plaintiff, through counsel, files his Motion for Leave to File Second Amended Complaint and, in support thereof, states:

1. This case is an action for medical negligence against Defendants in connection with the care and treatment of serious personal injuries sustained by Plaintiff.

2. Plaintiff seeks leave to amend his Complaint in order to add a Civil Rights cause of action under 42 U.S.C. Section 1983 against the original defendants and the newly named defendants, Calixto Calderon, Gabriel Zambrano, and Jose Ponce.

3. Accordingly, Plaintiff seeks leave to amend his Complaint to add Defendants:

    a. Calixto Calderon;

    b. Gabriel Zambrano; and

    c. Jose Ponce.

In support, Plaintiff incorporates herein and attaches hereto the deposition of Calixto Calderon as Exhibit "B," the deposition of Gabriel Zambrano as Exhibit "C," the deposition of Jose Ponce as Exhibit "D."

4. Further, Plaintiff seeks leave to amend to assert punitive damages based on the proffer of the depositions of Calderon, Zambrano, and Ponce, Plaintiff's medical records, and the Department of Justice Report. In support, Plaintiff incorporates herein the medical records of Pascual Diaz Plascencia, attached hereto as Exhibit "E" and the Department of Justice Report, attached to the Proposed Second Amended Complaint as Exhibit "B."

5. Defendants will not be unfairly prejudiced if this Motion is granted and Florida Rule of Civil Procedure 1.190 states that leave of court "shall be given freely when justice so requires." *See also Fotus v. Margules*, 98 So. 2d 394 (Fla. 3d DCA 1957); and *Penn Cork and Closures, Inc. v. Piggyback Shippers Assoc. of Florida, Inc.*, 281 So. 2d 46, 46 (Fla. 3d DCA 1973) ("[i]t is unnecessary to recite the numerous decisions of the courts of this state regarding the liberality in the granting of amendments to pleadings.")

6. This is the second time Plaintiff has sought to amend the Complaint in this case and Plaintiff has not abused that privilege.

7. A copy of the proposed Second Amended Complaint is attached as Exhibit "A".

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant his Motion for Leave to File Second Amended Complaint and requests the Second Amended Complaint be deemed filed at the time the Court enters the Order granting leave to Amend.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was served via e-service on June 3, 2016 on: Benjamin D. Simon, Esq., Assistant County Attorney, Miami-Dade County Attorney, Stephen P. Clark Center, Suite 2810, 111 NW First Street, Miami, FL 33128-1812; bdsimon@miamidade.gov and mbarber@miamidade.gov, Randall C. Berg, Jr., Dante Trevisani, Esq., Florida Justice Institute, Inc., 3750 Miami Tower, 100 South East Second Street, Miami, Florida 33131-2309; RBerg@FloridaJusticeInstitute.org and DTrevisani@FloridaJusticeInstitute.org

FREIDIN BROWN, P.A.
One Biscayne Tower – Suite 3100
Two South Biscayne Boulevard
Miami, Florida   33131
Tel.: 305-371-3666
Fax: 305-371-6725

By: _____

PHILIP FREIDIN
Florida Bar No: 118519
JONATHAN FREIDIN
Florida Bar No. 98955
pf@fblawyers.net
jf@fblawyers.net
dr@fblawyers.net
pleadings@fblawyers.net

# EXHIBIT A
# TO MOTION FOR LEAVE

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MI-
AMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

Case No: 2014-32220 CA 21

PASCUAL DIAZ- PLASCENCIA,

     Plaintiff,

vs.

PUBLIC HEALTH TRUST, d/b/a JACK-
SON MEMORIAL HOSPITAL and MI-
AMI-DADE COUNTY, FLORIDA,
JOSE ENRIQUE PONCE, GABRIEL
ZAMBRANO, AND CALIXTO
CALDERON,

     Defendants.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Pascual Diaz-Plascencia, sues Defendants, Public Health Trust d/b/a Jackson

Memorial Hospital, Miami-Dade County, Jose Enrique Ponce, Gabriel Zambrano,and Calixto

Calderon, and alleges:

### Introduction

1.     This is an action for damages alleging that the Defendants, in violation of the Four-

teenth Amendment to the U.S. Constitution, deliberately deprived Plaintiff Pascual Diaz-Plascen-

cia of medically necessary medications which resulted in the loss of his transplanted kidney,

thereby causing him considerable pain, the loss of the enjoyment of life, and decreased life expec-

tancy.  It is further alleged that Defendants Miami-Dade County ("County") and Public Health

Trust ("PHT") have for years been on notice of a well-known and documented "policy, practice

and custom" of not providing inmates in Miami-Dade County Jails with constitutionally adequate medical care. As a result, the U.S. Department of Justice ("DOJ") began a comprehensive investigation of Defendants' failure to provide medical care in 2008. After a 3½ year investigation, DOJ issued to the Defendants a "findings letter" on August 24, 2011, detailing its areas of concern, including the failure to timely administer medications to its patients and the failure to properly monitor and care for inmates with chronic illnesses. Despite these and other findings by the DOJ in 2011, Defendants persisted in not providing timely administration of essential medications to Mr. Diaz-Plascencia, which ultimately resulted in severe injuries to the Plaintiff, numerous hospitalizations, and the loss of his kidney. Defendants County and PHT are also sued for the common-law negligence of its employees.

### Jurisdiction and Venue

2.      Jurisdiction is proper in this Court pursuant to Fla. Stat. §§ 26.012 and 34.01 as this is an action for damages in excess of $15,000.00.

3.      Venue is proper in that all the actions relevant to these claims took place in this Circuit.

4.      All conditions precedent to bringing this action have occurred or have been performed, including the provisions of all notices required by Florida Statutes, including Fla. Stat. §§ 766 and 768.28.

### Parties

5.      Plaintiff, Pascual Diaz-Plascencia (hereinafter referred to as "Mr. Diaz-Plasencia"), is and was at all times material a resident of Miami-Dade County, Florida.

6.      Defendant, Public Health Trust, d/b/a Jackson Memorial Hospital (hereinafter referred to as "PHT"), was established by the Board of County Commissioners of Miami-Dade County, Florida, by Ordinance No. 73-69, codified in Chapter 25A of the Code of Miami-Dade

County, and under the authority of Fla. Stat. §§ 154.07 through 154.12, is and was at all times materially operating and doing business as a hospital, located in Miami-Dade County, Florida, and held itself out to the public as being a facility duly licensed under the laws of the State of Florida to provide medical health care, nursing care, surgical care, and other medically-related services, and employing duly licensed and properly skilled healthcare providers. Defendant PHT operated at all times material a division entitled Correctional Health Services (hereinafter referred to as "CHS") and employed physicians, residents, interns, physician assistants, nurses, aides, technicians and other healthcare providers to provide medical and mental health care services to the inmates in all jails operated by the Defendant County's Corrections and Rehabilitation Department. Defendant PHT is a governmental entity and operates under color of state law.

7.  Defendant, Miami-Dade County, Florida (hereinafter referred to as the "County") is and was at all times material a political subdivision of the State of Florida. Defendant County is and was responsible for the health and safety of inmates under responsibility of Defendant County's Corrections and Rehabilitation Department (hereinafter referred to as "MDCRD" or "CRD"). Defendant County designated the Defendant PHT to provide health care to inmates in the MDCRD. Defendant County has a non-delegable duty to provide constitutionally adequate medical care for inmates confined in the Defendant County's CRD. Defendant County operates under color of state law.

8.  Defendant Calixto Calderon is a medical doctor who served as CHS's Medical Director from August 2008 until July 2013. As such, Defendant Calderon was responsible for the medical care of all inmates in the Defendant County's Corrections and Rehabilitation Department. Defendants County and PHT delegated the responsibility of providing medical care to MDCRD inmates to Defendant Calderon such that his actions and omissions constituted actions and omissions by Defendants County and PHT. At all times material, Defendant Calderon was acting within the course and scope of his employment by Defendant PHT. Accordingly, Defendants PHT and the County are legally and vicariously liable for the acts of Defendant Calderon

Case No: 14-32220 CA 21
Page 4

for all violations of state law.  Defendant Calderon is also sued in his individual capacity for violations of the 14th Amendment to the U.S. Constitution.  At all relevant times, he acted under color of state law.

9.     Defendant Gabriel Zambrano is the current Associate Medical Director of CHS.  He has been employed by CHS since 2009, and became the Associate Medical Director in 2012 just prior to the events in this lawsuit.  As such, Defendant Zambrano was responsible for the medical care of inmates in the Defendant County's Corrections and Rehabilitation Department.  Defendants County and PHT delegated the responsibility of providing medical care to MDCRD inmates to Defendant Zambrano such that his actions and omissions constituted actions and omissions by Defendants County and PHT.  At all times material, Defendant Zambrano was acting within the course and scope of his employment by Defendant PHT.  Accordingly, Defendants PHT and the County are legally and vicariously liable for the acts of Defendant Calderon for all violations of state law.  Defendant Calderon is also sued in his individual capacity for violations of the 14th Amendment to the U.S. Constitution.  At all relevant times, he acted under color of state law.

10.     Defendant Jose Enrique Ponce is an Advanced Registered Nurse Practitioner (ARNP) employed Defendant PHT to work at the CHS since July 1989.  As such, Defendant Ponce is responsible for the medical care of inmates in the Defendant County's Corrections and Rehabilitation Department.  At all times material, Defendant Ponce was acting within the course and scope of his employment by Defendant PHT.  Accordingly, Defendant PHT is legally and vicariously liable for the acts of Defendant Ponce for all violations of state law.  Defendant Ponce is also sued in his individual capacity for violations of the 14th Amendment to the U.S. Constitution.  At all relevant times, he acted under color of state law.

### Factual Allegations

**The Repeated Failure to Provide Medications to Diaz-Plascencia
Resulting in the Loss of His Transplanted Kidney and Decreased Life Expectancy**

11.     On June 29, 2012, Plaintiff Diaz-Plascencia was detained and brought to one of Defendant Miami-Dade County's Corrections and Rehabilitation facilities, fingerprinted, and booked.  Defendants County and PHT assumed responsibility for the healthcare of Mr. Diaz-Plascencia, who was known to have a transplanted kidney requiring certain antirejection medications twice daily to preserve his heath and maintain his kidney.   He was also on medications for hypertension, Nexium, Bactrim, and aspirin.  It was noted on his intake form on June 29, 2012 by Defendant PHT's nurse that Mr. Diaz-Plascencia had last taken his medications on June 27, 2012.[1] Yet, the Defendant PHT's nurse made no effort whatsoever to have a health care provider order any of these medications on Friday, June 29, 2012.

12.     Plaintiff was next seen by Defendant PHT's health care provider,[2] Defendant Ponce, on Saturday, June 30, 2012.  Defendant Ponce knew that the antirejection medication was non-formulary, had to be specially ordered by the PHT's pharmacy, and would have to be approved in writing in advance by the CHS Medical Director, Defendant Calderon. Defendant Ponce also knew that was not likely to happen until Monday, July 1, 2012, and Mr. Diaz-Plascencia was not likely to receive the antirejection medication until Tuesday, July 2, 2012 at the earliest.  Defendant Ponce could have expedited the approval of the non-formulary medications by simply calling Defendant Calderon, but he elected not to do so.

13.     Instead, Defendant Ponce ordered the antirejection and other medications which Mr. Diaz-Plascencia so desperately needed by taking the slowest route possible: faxing the order to the CHS pharmacy without getting in advance the required permission of Defendant Calderon for the

---

[1] During the relevant time period, Plaintiff's medications—which were all known by the Defendants—were Prograf and Myfortic (for organ anti-rejection), nifedipine (for hypertension), aspirin (for blood clots), Bactrim (antibiotic), and Nexium (for acidity).
[2] The term "health care provider" as used by the Defendants pertains to all physicians, physicians' assistants, and advanced registered nurse practitioners.

non-formulary antirejection medication. Thus, Defendant Ponce knew that Mr. Diaz-Plascencia would be without his essential antirejection medication—which he knew were supposed to be given without fail twice daily—for at least 6 to 7 days. Defendant Ponce also knew that this delay would likely result in serious harm to the Plaintiff, including but not limited to pain, suffering, loss of his kidney, and decreased life expectancy. Yet Defendant Ponce failed to do anything that would prevent these negative outcomes.

14.     Further, as a result of poor record-keeping procedures at the Jail, the initial assessment form completed by Defendant Ponce on June 30, 2012, was misplaced. Accordingly, the form had to be completed again on July 1, 2012. At that point, Defendant Ponce knew that the Plaintiff had gone without his medication for at least 24-hours.

15.     Not only did Mr. Diaz-Plascencia never get on Tuesday, July 2, 2012, the antirejection medications which Defendant Ponce had ordered using the slowest method possible, he also did not receive the hypertension medication, Nexium, Bactrim, and aspirin. He was now 6 days without any medications.

16.     Defendant Ponce's failure to do anything more than merely order the antirejection medications proved devastating for Mr. Diaz-Plascencia.

17.     In addition, Defendant Ponce knew at the time that Defendant Calderon had decreased the number of formulary medications kept on hand at the CHS Pharmacy in an effort to save money, and for cost containment purposes. As a result, all non-formulary medications would have to be specially ordered, thereby further delaying the receipt of the antirejection medication. It was also well known by Defendant Ponce that prior to Mr. Diaz-Plascencia's incarceration, Defendant Calderon instituted a policy of having to personally approve any order of a non-formulary medication. Defendant Calderon instituted these new policies in an effort to save money no matter how essential the non-formulary drug. It was widely known that this policy which required prior

approval by Defendant Calderon for all non-formulary drugs—whether he was in the County or away on vacation—would result in a delay of the inmate's receipt of the drug with the hope he or she would be released, and thereby save the Defendant PHT the expense of having to provide many of the non-formulary medications.

18.     Defendants PHT's and Calderon's policy requiring the Medical Director personal approval before ordering all non-formulary medications proved disastrous for Mr. Diaz-Plascencia. Not only did Defendants Ponce and Zambrano do nothing to ensure that his patient got the medications he so desperately needed approved on an expedited basis, Defendant Calderon never saw either order, and as a result, never approved the ordering of the non-formulary antirejection medication. Even more inexplicably, Mr. Diaz-Plascencia never even received the common formulary medications such as Nexium and aspirin.

19.     On the seventh day without receiving any medications, Mr. Diaz-Plascencia was examined on July 3, 2012 by Dr. Zambrano, the Assistant Medical Director, as a result of seeing him in the hypertension clinic. As a result of knowing the Plaintiff had not received any medications for seven days at that point, Dr. Zambrano rewrote the same prescription for antirejection medications along with the other medications. Despite Dr. Zambrano's knowledge that Mr. Diaz-Plascencia needed to take the antirejection medications twice per day, every day without fail, and that no medications had been given for 7 days, Dr. Zambrano did absolutely nothing to ensure Mr. Diaz-Plascencia was given his antirejection medication. In fact, the only action Dr. Zambrano took was to simply rewrite the same prescriptions and fax same to the Pharmacy, just had Defendant Ponce had previously done. Dr. Zambrano did not call the pharmacy to inquire as to the whereabouts of the prior order for the medications, he did not call the pharmacy to ensure that the medications were delivered "stat" (i.e., expedited), and he did not call Defendant Calderon to ensure he expedited approval of the non-formulary medications. Instead, Dr. Zambrano also chose instead

{07126657;1}

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

to do as little as humanly possible and elected to just reorder the medications by faxing the order over just prior to a national holiday. The medications fortunately were delivered later that day, on July 3, 2012. But, as it would later turn out, the medications arrived too late to save the transplanted kidney.

20.     As a result of Defendants Ponce and Zambrano not ensuring the ordered, non-formulary anti-rejection medication prescription was filled, administered appropriately, and available at all times from June 29th until late July 3rd, Mr. Diaz-Plascencia had to be admitted to Jackson Memorial Hospital on an emergency basis from the Jail on July 7, 2012. He remained at the hospital until July 20, 2012.

21.     When Mr. Diaz-Plascencia returned to the Jail from Jackson Memorial Hospital on July 20, 2012, he was not immediately seen by a health care provider. In fact, he had to wait *three days* before seeing a health care provider on July 23, 2012, notwithstanding his chronic condition and extended hospital stay.

22.     Further, to ensure that what happened to him in late June would not happen again, JMH staff gave his correctional-officer escorts a bag with all of his medications. However, despite the fact that the Jail now had all of his medications from the Hospital, Defendants County and PHT again failed to administer Mr. Diaz-Plascencia's medications. Predictably, because of Defendants failure to properly care for him, in a relatively short period of time, Mr. Diaz-Plascencia's health had worsened, he became gravely ill, and had to immediately be readmitted to the renal transplant unit at JMH on July 23, 2012.

23.     Mr. Diaz-Plascencia again returned to the Jail on July 26, 2012 from JMH. As a result of Mr. Diaz-Plascencia not receiving the timely administration of his medication on several other occasions during the latter part of July, he had to *again* be readmitted on an emergency basis to JMH on August 1, 2012, August 12, 2012, and August 25, 2012.

24.     Mr. Diaz-Plascencia's repeated readmissions to JMH from the MDCRD were directly attributable to Defendant Zambrano's abandonment of his patient, Mr. Diaz-Plascencia, and failure to monitor him when returned to the Jail.  In fact, Defendant Zambrano failed to monitor Mr. Diaz-Plascencia for over a month after first seeing him in the hypertension clinic on July 3rd.

25.     Throughout this entire time, Mr. Diaz-Plascencia repeatedly complained to Jail guards and staff that he was not receiving his medications and that his condition was worsening. His calls for help went unanswered despite the visible signs of deterioration, such as prominent bruising and swelling all over his body.

26.     Further, at one point, Mr. Diaz-Plascencia's family notified jail officials that he was not receiving his medication, and provided his medication to jail officials.  Despite the Jail's ability to verify the identity of the medications, jail officials would not accept the medications Mr. Diaz-Plascencia so desperately needed.

27.     In summary, the ordered medications were not administered appropriately and were repeatedly not available to Mr. Diaz-Plascencia leading to emergency admissions to Jackson Memorial Hospital on July 7, 2012, July 23, 2012, August 1, 2012, August 12, 2012, and August 25, 2012.  During these times and others, Defendants County and PHT assumed responsibility for the healthcare of Mr. Diaz-Plascencia.

28.     The lack of appropriate medication administration and availability, as well as the failure by all the Defendants to have adequate policies and procedures in place, led to Mr. Diaz-Plascencia's pain and suffering, as well as his kidney transplant rejection and failure, thereby requiring another kidney transplant and resulting in a decreased life expectancy.

### The Miami-Dade County Jail's "Policy, Practice, and Custom" of Deliberate Indifference to Inmates' Serious Medical Needs

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

29.     Prior to the incidents that give rise to Mr. Diaz-Plascencia's constitutional viola-

tions and injuries, Defendants had for years been on notice of the widespread and longstanding

pattern of not providing proper medical care to inmates in the Defendant County's jails.

30.     The history of the Defendants County's and PHT's deliberate indifference to in-

mates' serious medical needs in its jails had been ongoing for over a decade prior to the events

which resulted in Mr. Diaz-Plascencia losing his kidney and are well documented.[3]

31.     Between 2000 and 2007, the Defendant County's CRD had approximately 117

inmate deaths, many of which were attributed to the Defendant PHT's failure to provide proper

medical treatment.  Since 2007, several unjustifiable inmate deaths have occurred.

32.     Defendants County and PHT, and many of their public officials, have long been

aware of their correctional facilities' failure to provide proper medical treatment.  For example:

    a.  Inmate Miguel Gonzalez communicated through his mother to Miami-Dade

        County Commissioner Jimmy Morales, requesting assistance in getting the

        medical treatment for his facial and orbital fractures that had been denied;

    b.  Inmate Cristobal Jimenez submitted complaints to Former County Manager

        George Burgess and Former Assistant County Manager Susanne Torriente, as

        well as the Former Mayor's Chief of Staff Dennis Morales, regarding his dia-

        betes, need for insulin medication, and the Department of Corrections' failure

        to administer his necessary medication from beginning of 2005 through Febru-

        ary 2006; and

    c.  Earl Moffett complained, through his mother, to Former Mayor Carlos Alvarez

---

[3] *See* Exhibit A: List of Miami-Dade inmates who did not receive proper medical care for their
serious medical condition while incarcerated.

regarding the MDCR's failure to provide medical treatment for a severe infection and renal dysfunction.

33.     Defendant County has been notified, mandated, and repeatedly ordered by judicial officers to provide proper medical treatment to its inmates.  For example:

a.   Former Miami-Dade County Judge David Young repeatedly ordered the Miami-Dade Department of Corrections and Rehabilitation to provide medical testing and care, but stated that his instructions were often ignored.

b.   The Honorable Bertila Soto ordered that Miami-Dade County Department of Corrections and Rehabilitation provide inmate Miguel Gonzalez with all medical treatment, including surgery that he required.

c.   Circuit Court Judge Victoria Sigler modified inmate Max Nuevas' sentence by releasing him in order for him to receive proper medical care.

d.   Judge Mark Leban entered an order recommending that the Miami-Dade Department of Corrections and Rehabilitation provide inmate Earl Moffet the necessary medical treatment; however, the order was ignored.

e.   Former Judge Lawrence Schwartz entered an Order mandating that Timothy P. Ryan, former director of Miami-Dade County Department of Corrections and Rehabilitation, provide necessary medical treatment to inmate Eliseo La Bruno.

34.     Additionally, Defendant County has been repeatedly sued on the basis of the MDCRD's and PHT's failure to provide proper medical care to its inmates. *See, e.g., La Bruno v. Miami-Dade Cnty.*, Case No. 10-22554-CIV, 2011 WL 1103783 (S.D. Fla. Mar. 23, 2011); *Ramos v. Miami-Dade County Board of County Commissioners et al*, Case No. 08-20065-CIV, (S.D. Fla. January 9, 2008); *Fisher v. Miami-Dade County*, 114 F.Supp.3d 1247 (S.D. Fla. 2015).  In *La Bruno*, the plaintiff, an HIV-positive inmate who recently suffered from a gunshot wound, alleged

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

that Defendant County and PHT failed to provide him with his prescription medication for the HIV virus or his gunshot wound.

35.     Defendants County and PHT were also aware of the poor record-keeping procedures that contributed to the inadequate medical care for inmates.  It was not uncommon for medical records to get lost.  This precluded orders from being filled, health care professionals from being aware of patients' medical "plans" going forward, and health care professionals from being advised of the patients' medical histories.

36.     Finally, *Miami Herald*, *Miami New Times,* and several local news stations have reported on the MDCR's failure to provide inmates with proper medical care, and widely reported on the U.S. Department of Justice's investigation on Defendants failure to provide medical care to its inmates.

### U.S. Department of Justice's 3½ Year Investigation

37.     On April 5, 2008, the U.S. Department of Justice initiated a three-and-a-half-year investigation regarding civil rights violations in the Miami-Dade County Department of Corrections and Rehabilitation. According to Grace Chung Becker, former Assistant U.S. Attorney General: "Federal authorities are investigating to determine whether there are systemic violations of the Constitution of the United States in the conditions at the Miami-Dade County Jail" and "will focus on protection of inmates from harm, including providing adequate suicide prevention measures, medical care, mental healthcare, protection from inmate violence and sanitation conditions, as well as the use of excessive force against inmates."

38.     Former Mayor Carlos Alvarez responded to the U.S. Department of Justice with a two-page memorandum outlining a plan to correct problems at Defendant Miami-Dade County's six main jail facilities. Though Mayor Alvarez acknowledged the problems and promised to correct the problems at the jail facilities, no action was taken by the County to remedy said problems.

Specifically, no action was taken by the Defendants County and PHT to remedy its repeated failure to provide proper medical treatment to inmates and no improvements were made to assist inmates to receive proper medical care while incarcerated in its six facilities.

39.     During the three and half year investigation, Defendant County provided the DOJ all of the necessary information it needed to make its conclusions concerning the failure to provide proper medical care to its inmates. DOJ also informed the Defendants County and PHT with the deficiencies it was finding during the course of its 3½ year investigation so things might get immediately corrected. Despite having knowledge of specific deficiencies and their failure to provide adequate medical care to inmates, Defendants failed to do anything to remedy the deficient functions in its medical care, including but not limited to providing adequate intake screening measures, record-keeping practices, management of chronic health issues, timely providing prescribed medications, and establishing an effective sick call process.

40.     As a result of the Defendants' failure to remedy ongoing problems, on August 24, 2011, the Department of Justice issued its "findings letter" which concluded among other things that Defendants County and PHT violated the constitutional rights of prisoners because, among other things, its correctional facilities are deliberately indifferent to the serious medical needs of prisoners.[4]

41.     The DOJ's "findings letter" highlighted five major areas of deficiencies by MDCR which included: correctional medical care intake screening and initial health assessments; access to care for acute medical needs; management of chronic health problems; proper medication administration; record keeping; and quality assurance.

---

[4] Exhibit B, U.S. Department of Justice "findings letter" to the Honorable Carlos Alvarez, Mayor of Miami-Dade County, August 24, 2011.

42.     The DOJ concluded that Defendants County and PHT consistently failed to iden-
tify and document acute and chronic care needs of prisoners entering the jail.  As a result, prisoners
endure severe and unnecessary pain, and even death, for injuries that could easily be prevented.
Defendant County and PHT's screenings and health assessments were untimely, cursory, and at
times performed by ill-trained professionals that failed to identify obvious signs of medical risk
to prisoner's health.

43.     The DOJ concluded that Defendants County's and PHT's sick call process is inef-
fective and toothless. When inmates request medical assistance, Defendants County and PHT rou-
tinely failed to act on the request or were delayed in reacting to inmates' medical complaint.  Those
inmates who actually receive a response are often seen for only a brief period of time, which does
not allow for a competent medical evaluation or medication administration. Defendants County's
and PHT's nurses do not employ standard protocols in seeing inmates (e.g., taking and recording
an inmate's vital signs).

44.     The DOJ concluded that Defendants County and PHT's medication administration
is chaotic, inefficient, and fraught with risk of errors that can cause serious harm to prisoners.  The
investigation revealed that six prisoners housed in one of the "psychiatric wings" received no
medications, even though the prisoners required an intensive level of mental health services.

45.     The DOJ concluded that Defendants County and PHT failed to provide adequate
medical care to inmates with chronic illnesses.  The investigation noted that Defendants County
and PHT do not have a fully functional chronic care program, which would allow the County and
PHT to track, monitor, and refer patients that have chronic illnesses to specialist.

46.     Finally, the County and PHT failed to keep complete, accurate, readily accessible,
and systematically organized medical records.  The DOJ's investigation concluded: "Medical
charts are often incomplete, fail to document specialist appointments, do not include the medical

staff member's name and title attached to notes, and illegible." Additionally, many of the inmates' charts do not contain nursing intake screening or booking officer screening. If medical professionals do not have access to the complete and accurate medical history of prisoners, they cannot provide proper care to their inmates and exposes these inmates to risk to serious harms.

47.     On or about April 16, 2013, the County entered a consent agreement with the United States to remedy the constitutional violations alleged in the August 24, 2011 "findings letter."

48.     On May 1, 2013, the DOJ, on behalf of inmates from the Miami-Dade County Corrections and Rehabilitation Department filed suit[5] in the Southern District of Florida against Miami-Dade County for violations of the inmates' constitutional rights, including but not limited to its failure to provide proper medical care to inmates.

49.     On May 22, 2013, U.S. District Court Judge William J. Zloch entered a Consent Decree, which was supposed to revise the standard of medical care to be provided by the MDCRD facilities.

## Defendant Calderon's Callous Indifference to DOJ Investigation and Findings Letter

50.     Undeterred by the DOJ's 2011 "findings letter" and later the Consent Decree, the County and PHT's systemic failure in providing medical care continued unabated.   In the years of 2012 and 2013, inmate deaths were in the double digits. A majority of these inmates died from the County's and PHT's failure to provide proper medical care. For instance, inmate Carl Dixon died from a seizure from delayed medical assistance. Inmate Joaquin Cairo broke his pelvis and suffered internal bleeding and died shortly thereafter. Juan Matos-Flores died after jailers found he had collapsed. Six others — Jose Leon, Joseph Wilner, Gerard Thomas Kenny, Ricardo

---

[5] *See United States v. Miami-Dade County*, Case No. 1:13-cv-21570-Zloch.

Monzon, Carl Dixon, and Albert Hightower — died from different medical ailments resulting from Defendants' continued failure to provide adequate medical care.

51.     Defendant Calderon assumed the position of Medical Director for the CHS division of the Defendant PHT in August 2008, just after the DOJ announced it was investigating the delivery of medical services in the MDCRD.  He had no idea what his duties and responsibilities were as the Medical Director, and to this day cannot state what his duties were.

52.     During the course of its 3½ year investigation, members of the DOJ medical inspection team would periodically meet with and inform Defendant Calderon of its interim findings.  But Defendant Calderon did nothing to correct the noted deficiencies.  He preferred to "stick his head in the sand" and ignore the DOJ's findings while his patients suffered.

53.     During the course of his tenure as the Medical Director, Defendant Calderon decreased the size of the pharmacy's formulary drug supply.  His decision to decrease the formulary was done intentionally with the expectation that some inmates would be released and as a result never need the non-formulary, more expensive drugs.  Decreasing the size of the formulary drugs invariably delayed an inmate's receipt of any non-formulary drug because they had to be specially ordered.  Defendant Calderon was well aware of the problem and elected to ignore it.  Defendant Calderon also continued a policy of having to personally approve the ordering of any non-formulary drug even if he was on vacation or out of the office.  All of these actions by Defendant Calderon contributed to delays in inmates receiving prescribed medications.

54.     Defendant Calderon had so little concern about the DOJ's investigation of the CHS where he was the Medical Director that he intentionally never bothered to do anything to correct the areas of concern identified in the DOJ's August 24, 2011 "findings letter."  The DOJ's "findings letter" stated that "MDCR inappropriately relies on medication management that fails to consistently incorporate diagnoses or treatment plan."  As to that portion of the "findings letter" which

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

pertained to Mr. Diaz-Plascencia, the DOJ "concluded that the Jail's medication administration is chaotic, inefficient, and fraught with risk of errors that can cause serious harm to prisoners." As a direct and proximate result of Defendant Calderon's intentional refusal to take aggressive action to correct this area of concern identified in the DOJ's "findings letter" pertaining to medication management, Mr. Diaz-Plascencia lost his transplanted kidney.

55.     After thirteen years of Defendants County and PHT failing to provide adequate medical care to its inmates, Commissioner Sally Heyman wrote a memo to Mayor Carlos Giminez, telling him to place the Department of Corrections on a management watch and that the Mayor and his office needed to take a stronger role in running corrections. Commissioner Heyman stated: "We have multiple issues. Significant problems that are systematic of a system, a department that is extremely broken to the detriment and the death of several people."

56.     In August 2013, Former Corrections Department Director Tim Ryan was questioned by Miami-Dade County Commission members of the Public Safety and Animal Services Committee regarding the eight inmate deaths from various medical ailments. At said meeting, a County Attorney cautioned the County Commission members to proceed with caution given that what they said could be utilized in a lawsuit against the County. Despite this warning, Commissioner Esteban "Steve" Bovo stated that: "A lot of the things we are seeing in the news have to be disturbing... When somebody goes into our jail and dies in our jail, that's a great concern." Unfortunately, these concerns developed too late for Mr. Diaz-Plascencia.

57.     The medical care became so inadequate that former Director Patrick Morse resigned and Medical Director Defendant Calderon was fired in July 2013, following the surge of inmate deaths and complaints about shoddy medical service. And of course, this was nearly two years after the DOJ's "findings letter" and almost a year after Mr. Diaz-Plascencia lost his transplanted kidney.

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

58.     Throughout the years, various organizations have publically decried the deplorable

conditions at the MDCRD's jails. Walter Clark, a former corrections officer, who runs an advo-

cacy group for black corrections employees, states that nothing has changed in regards to provid-

ing proper medical care to inmates.  John Rivera, chief of Miami-Dade's police union that repre-

sents corrections employees, says: "The list of problems in... Department of Corrections is long

and disturbing...That department is completely turned upside down...It's modern-day dungeon

conditions in these jails and [Tim]Ryan is not doing anything to make matters better."

59.     Defendants County's and PHT's long history of failing to provide adequate medi-

cal care to inmates has been uninterrupted despite having a federal investigation, entering a Con-

sent Decree, having numerous lawsuits, and public outcries from various community leaders and

Miami-Dade Commissioners.

### Claims for Relief

### Count I

### NEGLIGENCE CLAIM AS TO PUBLIC HEALTH TRUST
### d/b/a JACKSON MEMORIAL HOSPITAL

60.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1

through 59 above as if fully set forth herein.

61.     Defendant, Public Health Trust d/b/a Jackson Memorial Hospital, by and through

its actual, apparent and/or implied agents, servants and/or employees, including, but not limited

to its physicians, residents, interns, nurses, aides, technicians and other of Defendant PHT's

healthcare providers including but not limited to Jose Enrique Ponce, Gabriel Zambrano, and

Calixto Calderon, undertook the non-delegable duty to render to Plaintiff Diaz-Plascencia a

level of care, skill and treatment which, in light of all relevant surrounding circumstances, is

recognized as acceptable and appropriate by reasonably prudent similar health care providers

(also referred to as the prevailing professional standard of care).

62.    Defendant, Public Health Trust d/b/a Jackson Memorial Hospital, by and through

its actual, apparent and/or implied agents, including but not limited to Jose Enrique Ponce, Gabriel

Zambrano, and Calixto Calderon, servants and/or employees, including, but not limited to its doc-

tors and nurses, breached the prevailing professional standard of care to Plaintiff Diaz-Plascencia by

failing to do one or more of the following:

      a.   Failing to resolve the repeated unavailability of the ordered medication;

      b.   Failing to administer prescribed medication pursuant to Doctor's Orders;

      c.   Failing to order essential non-formulary and formulary medication on an emer-
         gency/stat basis;

      d.   Failing to follow Miami-Dade County Corrections and Rehabilitation Policy &
         Procedures and standard of care regarding medication administration;

      e.   Failing to report the lack of available prescribed medication to the ordering phy-
         sician;

      f.   Failure to report to the ordering physician and/or operational manager the lack
         of available prescribed medication; or

      g.   Failure to have adequate policies and procedures in place regarding the admin-
         istration of medication to inmates[sic], and to properly monitor chronic medical
         conditions such as hypertension.

63.    Defendant, Public Health Trust d/b/a Jackson Memorial Hospital, owed a non-

delegable duty to Pascual Diaz-Plascencia to provide: a) non-negligent medical services; b) the

non-negligent services of Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon; and c) non-

negligent nursing services;

64.    As set forth in Paragraphs 62(a) through 62(g), Defendant, Public Health Trust

d/b/a Jackson Memorial Hospital, breached that non-delegable duty.

65.    As a result of the negligence of Defendant, Public Health Trust d/b/a Jackson Me-

morial Hospital, by and through its actual, apparent and/or implied agents, servants and/or

employees, including but not limited to physicians, residents, interns, nurses, aides, technicians and other healthcare providers including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, Plaintiff Diaz-Plascencia, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are either permanent or continuing and plaintiff will suffer the losses in the future.

66.     Plaintiff has complied with all conditions precedent to the initiation of this action, including providing timely formal notice of this claim to all necessary parties, entities and agencies. The undersigned counsel hereby certifies that a reasonable investigation has been made to the extent permitted by the circumstances and the investigation supports the belief that grounds exist for the subject action initiated against the Defendants.

WHEREFORE, Plaintiff demands judgment for damages and costs against the Defendant, Public Health Trust d/b/a Jackson Memorial Hospital. Plaintiff further demands trial by jury of all issues triable as of right by jury.

## Count II

## NEGLIGENCE CLAIM AS TO MIAMI-DADE COUNTY

67.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth herein.

68.     Defendant, Miami-Dade County, by and through its actual, apparent and/or implied agents, servants, contractors, and/or employees, including, but not limited to its PHT contractors' physicians, residents, interns, nurses, aides, technicians and other healthcare providers also including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, undertook the non-delegable duty

to render to Plaintiff Diaz-Plascencia a level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers (also referred to as the prevailing professional standard of care).

69.    Defendant, Miami-Dade County, by and through its actual, apparent and/or implied agents, servants, contractors, and/or employees including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, servants and/or employees, including, but not limited to its PHT contractors' doctors and nurses, breached the prevailing professional standard of care to Plaintiff Diaz-Plascencia by failing to do one or more of the following:

a.    Failing to resolve the repeated unavailability of the ordered medication;

b.    Failing to administer prescribed medication pursuant to Doctor's Orders;

c.    Failing to order essential non-formulary and formulary medication on an emergency/stat basis;

d.    Failing to follow Miami-Dade County Corrections and Rehabilitation Policy & Procedures and standard of care regarding medication administration;

e.    Failing to report the lack of availability of prescribed medication to the ordering physician;

f.    Failure to report to the ordering physician and/or operational manager the lack of availability of the prescribed medication; and

g.    Failure to have adequate policies and procedures in place regarding the administration of medication to inmates.

70.    Defendant, Miami-Dade County, owed a non-delegable duty to Mr. Diaz-Plascencia to provide: a) non-negligent medical services; b) the non-negligent services of Defendants Ponce, Zambrano, and Calderon; and c) non-negligent nursing services.

71.    As set forth in Paragraphs 69(a) through 69(g), Defendant, Miami-Dade County,

breached that non-delegable duty.

72.     As a result of the negligence of Defendant, Miami-Dade County, by and through its actual, apparent and/or implied agents, servants and/or employees, including but not limited to physicians, residents, interns, nurses, aides, technicians and other healthcare providers also including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, Plaintiff Diaz-Plascencia suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

73.     Plaintiff has complied with all conditions precedent to the initiation of this action, including providing timely formal notice of this claim to all necessary parties, entities and agencies. The undersigned counsel hereby certifies that a reasonable investigation has been made to the extent permitted by the circumstances and the investigation supports the belief that grounds exist for the subject action initiated against the Defendants.

WHEREFORE, Plaintiff demands judgment for damages and costs against the Defendant, Miami-Dade Count. Plaintiff further demands trial by jury of all issues triable as of right by jury.

## Count III

## VICARIOUS LIABILITY OF PUBLIC HEALTH TRUST d/b/a JACKSON MEMORIAL HOSPITAL

74.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth herein.

75.     Defendant, Public Health Trust d/b/a Jackson Memorial Hospital, by and through

its actual, apparent and/or implied agents, is vicariously liable for the negligence of physicians, residents, interns, nurses, aides, technicians and other healthcare providers including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon.

76.     Defendant, Public Health Trust d/b/a Jackson Memorial Hospital, by and through its actual, apparent and/or implied agents, is vicariously liable for the negligence of physicians, residents, interns, nurses, aides, technicians and other healthcare providers including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, had a duty to provide medical care and treatment to Plaintiff Diaz-Plascencia that conformed with the prevailing standard of care.

77.     Defendant PHT employees Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, breached the prevailing professional standard of care to Plaintiff Diaz-Plascencia by doing one or more of the following:

   a.     Failing to resolve the repeated unavailability of the ordered medication.

   b.     Failing to administer prescribed medication pursuant to Doctor's Orders;

   c.     Failing to order essential non-formulary and formulary medication on an emergency/stat basis;

   d.     Failing to follow Miami-Dade County Corrections and Rehabilitation Policy & Procedures and standard of care regarding medication administration;

   e.     Failing to report the lack of availability of prescribed medication to the ordering physician;

   f.     Failing to report to the ordering physician and/or operational manager the lack of availability of the prescribed medication; or

   g.     Failing to have adequate policies and procedures in place regarding the administration of medication to inmates.

78.     As a result of Jose Enrique Ponce's, Gabriel Zambrano's, and Calixto

{07126657;1}

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

Calderon's negligence, Plaintiff Diaz-Plascencia suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are either permanent or continuing and plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment for damages and costs against the Defendant, Public Health Trust d/b/a Jackson Memorial Hospital. Plaintiff further demands trial by jury of all issues triable as of right by jury.

### Count IV

### VICARIOUS LIABILITY OF MIAMI-DADE COUNTY

79.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth herein.

80.     Defendant, Miami-Dade County, by and through its actual, apparent and/or implied agents or contractor, is vicariously liable for the negligence of its PHT contractors' physicians, residents, interns, nurses, aides, technicians and other healthcare providers including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon.

81.     Defendant, Miami-Dade County, by and through its actual, apparent and/or implied agents or contractors, is vicariously liable for the negligence of physicians, residents, interns, nurses, aides, technicians and other healthcare providers including, Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, had a duty to provide medical care and treatment Plaintiff Diaz-Plascencia that conformed with the prevailing standard of care.

82.     Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon, breached the prevailing professional standard of care to Plaintiff Diaz-Plascencia by doing one or more of the following:

{07126657;1}                    FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

Case No: 14-32220 CA 21
Page 25

   a.     Failing to resolve the repeated unavailability of the ordered medication;

   b.     Failing to administer prescribed medication pursuant to Doctor's Orders;

   c.     Failing to order essential non-formulary and formulary medication on an emergency/stat basis;

   d.     Failing to follow Miami-Dade County Corrections and Rehabilitation Policy & Procedures and standard of care regarding medication administration;

   e.     Failing to report the lack of availability of prescribed medication to the ordering physician;

   f.     Failure to report to the ordering physician and/or operational manager the lack of availability of the prescribed medication; or

   g.     Failure to have adequate policies and procedures in place regarding the administration of medication to inmates.

83.    As a result of Jose Enrique Ponce, Gabriel Zambrano, and Calixto Calderon's negligence, Plaintiff Diaz-Plascencia suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are either permanent or continuing and plaintiff will suffer the losses in the future.

     WHEREFORE, Plaintiff demands judgment for damages and costs against the Defendant, Miami-Dade County. Plaintiff further demands trial by jury of all issues triable as of right by jury.

### Count V

**VIOLATION OF THE 14th AMENDMENT VIA 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE TO PLAINTFF'S SERIOUS MEDICAL NEEDS AGAINST DEFENDANTS PONCE, ZAMBRANO AND CALDERON**

84.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth therein.

85.     Plaintiff's claim for relief is predicated upon 42 U.S.C. § 1983 which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured to people by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988 which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

86.     Defendants Ponce, Zambrano, and Calderon's deliberate indifference to the Plaintiff's serious medical needs was in violation of the Fourteenth Amendment to the U.S. Constitution.   Defendants Ponce's and Zambrano's knowledge of the Plaintiff's need for this essential medication and his intentional refusal to order it on a timely basis was tantamount to not providing any medical care at all, and constitutes deliberate indifference to the Plaintiff's serious medical needs.   Their refusal to expedite the ordering of this essential medication was medical care so cursory as to amount to no medical care at all.

87.     Despite Defendant Zambrano's knowledge of the Plaintiff not receiving time medications, and becoming so gravely ill that he had to be sent repeatedly to JMH, Defendant Zambrano intentionally failed to monitor his patient on his return from JMH to ensure he was properly taken care of and received the proper administration of his medications in the Jail.   His refusal to monitor his patient on his return from the hospital resulted in his patient relapsing, and having to be repeatedly returned to JMH, and eventually resulted in the loss of his kidney.   Defendant Zambrano's failure to monitor his patient was medical so cursory as to amount to no medical care at all.

88.     Defendant Calderon intentionally refused to make changes to those areas of concern identified by the DOJ's investigators during the course of its 3½ year investigation constituted deliberate indifference to the serious medical needs of the inmates in his care, including Plaintiff.   Defendant Calderon's obliviousness and lackadaisical attitude after the issuance of the DOJ's

"findings letter" on August 24, 2011 – including the proper administration and management of medications – constituted knowledge of the need for medical care, and the intentional refusal to provide it.

89.     Defendants Ponce's, Zambrano's, and Calderon's intentional failure to provide Plaintiff Diaz-Plascencia with necessary antirejection medication and in the meantime remain in pain and eventually lose his transplanted kidney is tantamount to providing no medical care at all. Defendants Ponce, Zambrano and Calderon knew Plaintiff had a serious medical need that would lead to serious harm to Plaintiff if left untreated. Yet, despite this knowledge, these Defendants intentionally failed to provide the necessary treatment. These Defendants were deliberately indifferent to Plaintiff's serious medical needs.

90.     Defendants Ponce's, Zambrano's, and Calderon's deliberate indifference to Plaintiff's serious medical needs directly and proximately caused harm to Plaintiff, including but not limited pain, suffering, loss of his transplanted kidney and decreased life expectancy.

### Prayer for Relief

WHEREFORE, Plaintiff Diaz-Plascencia demands the following relief:

A.     Enter judgment declaring that the Defendants Ponce, Zambrano, and Calderon have violated the Plaintiff's right to constitutional medical care, as secured by the Fourteenth Amendment to the Constitution of the United States of America;

B.     Award Plaintiff compensatory and punitive damages against Defendants Ponce, Zambrano, and Calderon;

C.     Award attorneys' fees, expenses and costs of suit pursuant to 42 U.S.C. § 1988; and

D.     Award such other relief as the Court may deem equitable and just under the circumstances.

### Count VI

## VIOLATION OF THE 14th AMENDMENT VIA 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AGAINST DEFENDANTS COUNTY AND PHT: *MONELL* CLAIM

91.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth therein.

92.     Plaintiff's claim for relief is predicated upon 42 U.S.C. § 1983 which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured to people by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988 which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

93.     The acts and conduct of the Defendants County and PHT in being deliberately indifferent to the Plaintiff's serious medical needs was in violation of the Fourteenth Amendment to the Constitution of the United States.

94.     Defendants County and PHT had a policy, practice and custom of deliberate indifference to the serious medical needs of inmates in its care. Specifically, Defendants County and PHT failed to remedy a widespread and longstanding practice of providing inadequate medical treatment to inmates with serious medical needs incarcerated in its MDCRD facilities, and in this instance the proper administration of essential medications. The failure to remedy this practice resulted in the formation of a *de facto* policy, practice, or custom of deliberate indifference to the serious medical needs of inmates.

95.     Defendants County and PHT showed deliberate indifference to Plaintiff's serious medical need. Defendants County and PHT knew of Plaintiff's serious need for medication, yet intentionally failed to provide said medication, in spite of high risk to Plaintiff of rejection and failure of the transplant organ.

96.     Senior officials and employees of Defendants County and PHT, as well as Defend-

ants and their policymakers for inmate medical care, knew of the pattern, practice, policy, and

custom of deliberate indifference to serious medical needs, yet, with deliberate indifference to the

constitutional rights of jail inmates, failed to stop or correct them.

97.     Defendants County's and PHT's deliberate indifference to Plaintiff's serious med-

ical need though a pattern, practice and policy of improper administration of medication directly

and proximately caused his injuries.   Defendants County's and PHT's failure to intervene and

failure to provide the proper administration of his medication directly and proximately caused the

rejection of his kidney, along with the associated health consequences and pain and suffering.

### Prayer for Relief

WHEREFORE, Plaintiff Diaz-Plascencia demands the following relief:

A.     Enter judgment declaring that the Defendant County and PHT have violated the

Plaintiff's right to be free from Cruel and Unusual Punishment, as secured by the Fourteenth

Amendment to the Constitution of the United States of America;

B.     Award Plaintiff compensatory damages against Defendants County and PHT;

C.     Award attorneys' fees, expenses and costs of suit pursuant to 42 U.S.C. §1988; and

D.     Award such other relief as the Court may deem equitable and just under the circum-

stances.

On all counts, Plaintiff requests such other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

### CERTIFICATE OF GOOD FAITH

I hereby certify that a reasonable investigation has been conducted which gave rise

Case No: 14-32220 CA 21
Page 30

to the belief that grounds exist for an action against the defendants named herein.

Dated ___6/3/2016___

FREIDIN BROWN, P.A.
One Biscayne Tower – Suite 3100
Two South Biscayne Boulevard
Miami, Florida  33131
Tel: 305-371-3666

FLORIDA JUSTICE INSTITUTE, INC.
3750 Miami Tower
100 South East Second Street
Miami, Florida  33131-2309
305-358-2081
305-358-0910 fax

By: _____ (fr)

PHILIP FREIDIN
Florida Bar No: 118519
JONATHAN FREIDIN
Florida Bar No. 98955
pf@fblawyers.net
jf@fblawyers.net
dr@fblawyers.net
pleadings@fblawyers.net


and

Randall C. Berg, Jr., Esq.
Fla. Bar No. 318371
Rberg@FloridaJusticeInstitute.org
Dante Trevisani, Esq.
Fla. Bar No. 72912
DTrevisani@FloridaJusticeInstitute.org

Attorneys for the Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY certify that the foregoing was emailed to the following recipients on  3rd day

Case No: 14-32220 CA 21
Page 31

of June 2016.


Benjamin Simon, Esq.
Assistant County Attorney
**MIAMI-DADE COUNTY ATTORNEY**
Stephen P. Clark Center, Suite 2810
111 Northwest First Street
Miami, Florida 33128-1993
T: (305) 375-5961
F: (305) 375-5611
Email:
emily@miamidade.gov

*Attorney for Defendants Public Health
Services, Miami-Dade County
Corrections and Rehabilitation
Department*

_____
PHILIP FREIDIN
Florida Bar No: 118519

{07126657;1}

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666, Fax: 305.371.6725

Case No: 14-32220 CA 21
Page 32

**Exhibit A**

| Inmate | Date(s) of Incarceration | Serious Medical Condition | Injury | Miami-Dade's Response |
|---|---|---|---|---|
| Joshua Mancas | Oct 31, 2002 – July 7, 2004 | Contracted MRSA while incarcerated | Suffered for months from a painful abscess | Repeatedly dismissed his requests for medical treatment |
| David Famiglietti | August 2004 | Contracted MRSA while incarcerated | Leg swelled until pus was removed | Delayed treatment, once treatment was finally provided, surgeons removed 500 cubic cm of pus from his groin area |
| Max Nuevas | 2005 | Contracted MRSA while incarcerated | Body-wide rash; eyes swelled shut and entire body swelled up | Failed to treat MRSA |
| Miguel Escandon | Aug 14, 2004 – Sept 15, 2004 | Known diabetic (Insulin dependent) | Continues to suffer medically as result of sporadic and insufficient insulin treatment while incarcerated | Repeatedly denied him the opportunity to go to clinic to replenish his insulin |
| Cristobal Jiminez | 2005 | Known diabetic (Insulin dependent) | Post-incarceration has been hospitalized twice due to high blood sugar resulting from his sporadic and insufficient treatment from incarceration | Sporadically and insufficiently provided him insulin, leading to high blood pressure |
| Willie Daniels | Jan 29, 2006 | Hypothermia | Death | Created the inhumane conditions that caused his death, insufficient clothing, lack of proper bedding for inmates |

| | | | | |
|---|---|---|---|---|
| Rodolfo Ramos | Feb 14, 2006 – Apr 14, 2007 | Non-insulin dependent diabetes, Inability to walk | Death from failure to provide necessary medications that were prescribed to him | Failed to provide the necessary medication |
| Earl Moffet | Jan 6, 2007 | Renal failure and MRSA | Required hospitalization for 11 days, medical deterioration of multiple organs, including kidneys | Failed to properly treat his serious medical condition |
| Kippo Pruitt | April 21, 2007 – May 21, 2007 | Diabetic | Entered a diabetic coma and died subsequently | Failed to provide necessary insulin |
| Eugene Smith | May 21, 2004 – April 1, 2007 | Suicide watch | Died from medication overdoses taken from jail | Failed to adequately monitor his medication |
| Miguel Gonzalez | Sept 10, 2003 – Sept 29, 2004 | Suffered multiple facial fractures, intracranial hemorrhage, subdural hematoma, papilledema, facial lacerations, a fractured left orbit, a skull fracture, a nasal bone fracture, and a lateral medial left maxillary from an attack from a fellow inmate | Incurred unnecessary pain and suffering | Delayed follow up appointment when notified by his doctor the necessity of follow up treatment |
| Roderick Jones | Jan 2005 | Known diabetic (insulin dependent) | Five days of hospitalization from the denial of insulin | Sporadically and insufficiently provided him insulin, leading to high blood pressure |
| Eliseo La Bruno | Dec 13, 2007 – July 21, 2008 | Gunshot Wounds and HIV | Incurred unnecessary pain and suffering due to failure to treat | Repeatedly denied inmate appropriate antibiotic medication |

{07126657;1}

Case No: 14-32220 CA 21
Page 34

| | | | inmates HIV and gunshot wounds, progression of his HIV | and wound dressing for gunshot wounds and failed to provide inmate proper medication for his HIV for 7 months |
|---|---|---|---|---|
| Inmate identified as EE | July 9, 2008 | Seizures suffered within hours and had high blood pressure | Died within 12 hours of intake screening | Inaccurately screened, did not monitor inmate after seizure, nor did they monitor inmate's blood pressure, vital signs, or conduct further clinical evaluation |
| Inmate identified as BB | May 22, 2008 | Known history of drug withdrawal | Became unresponsive and died within hours of incarceration | Failed to adequately monitor inmate despite his known history for drug withdrawal and failed to apply automated external defibrillator to inmate who exhibited no pulse or respirations |
| Inmate identified as AA | April 9, 2008 | Known history of congestive heart failure | Elevated blood pressure and died. | Failed to receive treatment from a physician |
| Inmate identified as CC | March 6, 2008 – March 7, 2008 | Abnormal pulse | Death within 24 hours of intake | Physician did not review the nurse assessment indicating the elevated pulse and no follow-up vital sign monitoring |
| Inmate identified as DD | November 6, 2007 – November 8, 2007 | Known infection in DD's chest wall and drug withdrawal | Death within 24 hours of intake | Failed to follow up the inmate and closely monitor his vitals |

{07126657;1}

| Inmate identified as FF | November 5, 2007 – January 5, 2008 | Complained of chest pain and gas pain. Hypertension. | Death for failure to treat said inmate | Failed to follow inmate with a qualified physician after the complaints of chest and gas pain |
|---|---|---|---|---|
| Inmate identified as GG | October 23, 2007 | Complained of shortness of breath | Death | Failed to perform an adequate exam to identify the proper diagnosis |
| Rafael Andres | May 22, 2009 – May 3, 2010 (date of injury to last failure of county) | Broke his hand after fall | Daily pain and loss of majority of movement and strength of his hand after infection due to multiple surgeries | Failed to treat the break or put hand in cast, failed to timely remedy the damage caused by not putting hand in cast, failed to promptly get emergency help when he had severe infection |
| Gregory Fisher | April 4, 2011 – April 11, 2011 | Residual paralysis of the bowel and bladder | Severe pain, confinement to a wheel chair in excess of 8 months, brady-cardia, hydro ne-phrosis, and kidney infection | Refused to grant medical treatment, to provide catheters and laxatives necessary |
| Andrew Taylor Hutchinson (case was dismissed because he had not completed in-prison process) | May 2009 | Bladder Stone Removal | Pain and damage to his bodily organs | Failed to receive prescription to avoid infection, failure to monitor his condition |
| James Cramer (nothing in file past response to summary judgment motion) | 2010-2011 | Known diabetic who had suffered injuries at RMC from improper treatment | Loss of hearing, high HBAIC levels | Failure to provide medication on a timely basis |
| Giancarlo Lafont (case summary says that the | October 4, 2010 | Hypothyroidism, low testosterone, and glaucoma | Headaches, clouded vision, | Failure to provide medication |

Case No: 14-32220 CA 21

Page 36

| | | | low energy, diz-ziness, weak-ness, inability to stand for long periods of time or to exercise | |
|---|---|---|---|---|
| medical records show he has been receiving adequate treat-ment and that his conditions have not worsened) | | | low energy, diz-ziness, weak-ness, inability to stand for long periods of time or to exercise | |
| Gary Grimes | Aug 23, 2010 (date of incident) | Knee hurt in transport | Pain | Nurse would not let Grimes see doctor day after incident, would not x-ray knee |
| Baxter Tisdale | May 15, 2009 (date of fall) | Serious back condition due to fall | Loss of mobility, chronic back pain | Delayed exami-nation, no treat-ment except pain pills when he was seen |
| Claudychel Levya | July 20, 2010 (date of incident) | Fractured right hand | Pain | No medication for 9 days |
| Perry Keith Mar-tin | November 16, 2010 (date of in-cident) | Acute mandibu-lar fracture | Pain, lost weight | Ignored his con-dition and did not grant special diet / slow eating pass after his surgery |
| Permon Thomas | July 10, 2009 (date of surgery) | Knee surgery | Extreme knee pain, loss of mo-tion | Denied knee therapy |
| Joaquin Cairo | July 2013 | Broken pelvis, internal bleeding after attack | Death | Delay for days in getting Cairo to the emergency room |
| Juan Matos-Flo-res | April 2013 | Unresponsive on floor | Death | Delay because couldn't call out from 9th floor, had to first call another floor |

# *EXHIBIT B*



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　　　　　　*Washington, D.C. 20530*

The Honorable Carlos A. Gimenez　　　　　　**AUG 24 2011**
Mayor, Miami-Dade County
Stephen P. Clark Center
111 Northwest First Street, 29th Floor
Miami, FL 33128

　　　　Re:　　Investigation of the Miami-Dade County Jail

Dear Mayor Gimenez:

　　The Department of Justice's Civil Rights Division has concluded its investigation of conditions at the corrections facilities operated by the Miami-Dade County Corrections and Rehabilitation Department ("MDCR"). This letter provides MDCR with our findings.

　　On April 2, 2008, we notified officials of Miami-Dade County ("County") of our intent to investigate the MDCR corrections facilities pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C.§ 1997. CRIPA gives the Department of Justice authority to seek a remedy for a pattern or practice of conduct that violates the constitutional rights of prisoners in adult detention and corrections facilities. CRIPA requires that we advise you of the findings of our investigation, the facts supporting them, and the minimum remedial steps that are necessary to address the deficiencies we have identified. 42 U.S.C. § 1997b.

## I.　SUMMARY OF FINDINGS AND CONCLUSIONS

　　We conclude that that there is a pattern and practice of constitutional violations in the correctional facilities operated by MDCR, and as a result of the unconstitutional operation of the Jail, prisoners suffer grievous harm, including death. As described more fully below, our specific findings include:

- MDCR is deliberately indifferent to the suicide risks and serious mental health needs of its prisoners. At least eight prisoners have committed suicide since 2007, and thousands of prisoners have suffered from inadequate mental health crisis services.

- MDCR fails to provide adequate acute care, chronic care, outpatient treatment, and

- 2 -

discharge services to prisoners with mental illness. Instead, MDCR inappropriately relies on medication management that fails to consistently incorporate diagnoses or treatment plans, even for prisoners with the most serious mental illnesses.

- MDCR is deliberately indifferent to the serious medical needs of prisoners including access to care for acute medical needs, management of chronic health problems, and record keeping and quality assurance. Prisoners wait weeks and even months to receive consultations for care from HIV, cardiology, and neurology specialists.

- MDCR fails to provide adequate intake screening, initial health assessments and acute care for newly incarcerated prisoners. Since 2008, at least five prisoners have died from MDCR's failure to identify and treat prisoners withdrawing from drugs or alcohol.

- MDCR is engaged in a pattern or practice of using excessive force against prisoners. MDCR corrections officers openly engage in abusive and retaliatory conduct, which frequently causes injuries to prisoners.

- MDCR is deliberately indifferent to the serious risk of harm to prisoners posed by fellow prisoners. Corrections officers fail to supervise prisoners, particularly prisoners known to be violent, resulting in ongoing harm and serious risk of harm. There is significant evidence to be concerned that the Jail fails to take reasonable steps to protect prisoners from sexual assault.

- The conditions of confinement within the Jail expose prisoners to an unreasonable risk of harm from inadequate fire and life safety systems and environmental health and sanitation deficiencies, including unreasonable risk of infection from overcrowding and inadequate laundry, housekeeping, and pest control.

## II. INVESTIGATION

On June 9-13, 2008, June 16-20, 2008, and April 7-8, 2009, we inspected the facility together with consultants in the fields of corrections, custodial medical and mental health care, suicide prevention, and environmental health and sanitation. We interviewed administrative and corrections staff, medical and mental health care providers, prisoners, and members of the Miami-Dade community. Our investigation also included the review of policies and procedures, incident reports, grievances, medical records, and use of force records and investigations, including documents provided by the County subsequent to our on-site visits. In keeping with our pledge of transparency and providing technical assistance where appropriate, our consultants conveyed their preliminary impressions and concerns to County officials and the MDCR command staff at the conclusion of our tours.

We are grateful to MDCR Director Timothy P. Ryan and his entire staff for the assistance and cooperation extended to us. We found the MDCR officials helpful and professional throughout the course of the investigation. MDCR provided us with access to records and personnel, and responded to our requests, before, during, and after our on-site visits, in a transparent and forthcoming manner. We also appreciate MDCR's receptiveness to our consultants' on-site recommendations.

- 3 -

## III. BACKGROUND

The corrections facilities operated by MDCR (collectively "Miami-Dade County Jail" or "the Jail") hold an average of 7,000 prisoners in a complex of buildings spread out across the county, making it the nation's eighth largest jail. The Jail has six corrections facilities: the Pre-Trial Detention Center ("PTDC"); the Women's Detention Center ("WDC"); the Training and Treatment Center ("Stockade"); the Turner Guilford Knight Correctional Center ("TGK"); and the Metro West Detention Center ("MWDC"). Additionally, MDCR operates a boot camp program, with a housing facility adjacent to TGK ("Boot Camp").

The prisoners incarcerated in the Jail are awaiting trial or serving sentences of less than one year. Two of the five facilities, PTDC and TGK, are booking facilities. These two facilities process and house all classifications of prisoners. PTDC, the County's main jail building located across the street from the County Courthouse, has approximately 1,700 beds for male prisoners, and TGK has 1,300 beds for male, female, and juvenile prisoners. WDC has 375 beds and only houses female prisoners. The Stockade, the oldest MDCR facility, has approximately 1,200 beds for adult males. The largest of the five facilities is the MWDC, which is located approximately 16 miles west of PTDC and downtown Miami, and has approximately 3,000 beds for male prisoners of all classifications.

Health care, including mental health care, is provided to prisoners on-site by Correctional Health Services ("CHS"), a division of the Jackson Health System of Miami-Dade County (a community healthcare system consisting of Jackson Memorial Hospital, primary care centers, health clinics, and rehabilitation, nursing, and mental health facilities). Additionally, the Jackson Memorial Hospital, the largest of the medical centers operated by the Jackson Health System, maintains a specialized unit known as "Ward D" to provide emergency hospital care to MDCR prisoners in a secure environment staffed by MDCR corrections officers. Each month, CHS staff members see several thousand prisoner-patients, several hundred of whom require physician-level care, and approximately 75 prisoners who need inpatient care at Ward D. Moreover, of the approximately 7,000 MDCR prisoners, on average 1,000 suffer from mental illness, making the Jail one of the largest psychiatric facilities in Florida.

## IV. FINDINGS

### A.  MDCR PROVIDES CONSTITUTIONALLY INADEQUATE MEDICAL AND MENTAL HEALTH CARE.

Jail prisoners have a constitutional right to be protected from harm, Farmer v. Brennan, 511 U.S. 825, 832 (1994), and serious risk of harm, Helling v. McKinney, 509 U.S. 25, 33-35 (1993). Whether that harm takes the form of illness, injury, or inhumane conditions, jailers cannot display "deliberate indifference" to a prisoner's serious needs. Wilson v. Seiter, 501 U.S. 294, 302-303 (1991) (citing Estelle v. Gamble, 429 U.S. 97, 104-106 (1976)). MDCR is deliberately indifferent to the risk of suicide and the serious medical and mental health needs of prisoners. As illustrated below, the constitutional deprivations uncovered by our investigation are not the result of isolated incidents or the misconduct of a few MDCR staff members. Instead,

- 4 -

MDCR's deliberate indifference to protecting the Jail's prisoners from harm is a systemic failure.

> 1.    MDCR is deliberately indifferent to prisoners' suicide risks and serious
>        mental health needs.

Our investigation revealed that MDCR is deliberately indifferent to the suicide risks and serious mental health needs of prisoners who present symptoms of suicidal behavior or serious mental illness. See Campbell v. Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999) (noting that a failure to provide proper medical care, includes a psychiatrist providing grossly inadequate medical care); Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996) (same); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (noting that "this court has acknowledged that the deliberate indifference standard also applies to inmates' psychiatric or mental health needs."). Furthermore, jail officials have a constitutional obligation to act when there is a strong likelihood that a prisoner will engage in self-injurious behavior, including suicide. See Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268-69 (11th Cir. 2005) (noting defendants are deliberately indifferent if there is a strong likelihood that an inmate would commit suicide). In jail suicide cases alleging constitutional violations, "the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Cook ex. rel. Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003)). Deliberate indifference is demonstrated by: "(1) subjective knowledge of a risk of serious harm; (2) disregard of... that risk; (3) by conduct that is more than mere negligence." Cook, 402 F.3d at 1115 (quoting Cagle at 986).

We observed systemic failures to address serious risks of prisoner suicide and to treat prisoners' serious mental health needs. Thousands of prisoners with serious mental illness have suffered in the Jail in recent years without adequate care. Instead, medication management is the only treatment available, and it is plagued with errors. The Jail does not provide adequate mental health crisis services, including access to: beds in a health care setting for short-term treatment and acute care (an inpatient level of care); chronic care and/or a special needs unit for prisoners who cannot function in the general population; outpatient treatment for prisoners in the general population; or services for prisoners in need of further treatment at the time of transfer to another institution or discharge to the community.

> a.    MDCR is deliberately indifferent to prisoners who pose a significant
>        risk of suicide and self-harm.

Eight Miami-Dade County prisoners, including one in March 2011, committed suicide in the past four years, illustrating the harm resulting from MDCR's failure to take reasonable preventative measures.

> • *The Death of A.N.*[1] On March 26, 2011, at approximately 9:45 p.m., A.N., a 24-year-old male, committed suicide by asphyxiation with a bed sheet tied around his neck. A.N. was booked on August 3, 2010. At various times during his incarceration at MDCR, he was evaluated by mental health providers as suicidal.

---

[1]    To protect the identity of prisoners, we use coded initials throughout this letter.

- 5 -

A.N. was housed in the general psychiatric unit. On February 4, 2011, less than one month prior to his death, A.N. was evaluated as suicidal and placed in the suicide precaution housing unit. He was subsequently returned to the general psychiatric unit, where he reportedly committed suicide on March 26, 2011.

*The Death of A.G.:* On September 16, 2010, at approximately 6:30 p.m., A.G., a 33-year-old male was found by a correctional officer hanging in his cell. A.G. was booked on September 10, 2010. The next day, the Jail transported him to the emergency room, noting him to be combative and psychotic. A.G. returned later that day, was seen by a mental health provider, and subsequently cleared for general population in medium level custody on September 14, 2010. There, A.G. reportedly committed suicide on September 16, 2010 by affixing a sheet to an upper corner portion of the cell and asphyxiating himself.

*The Death of A.H.:* On February 11, 2010, A.H., a 40-year-old female was found by a corrections officer hanging by a bed sheet. A.H. was booked into the Women's Detention Center on February 9, 2010. She was reportedly seen by a mental health care provider and cleared for general population. Subsequently, A.H. was sent to administrative segregation under medical observation. There, A.H. reportedly committed suicide on February 11, 2010 by affixing a sheet to a vent and asphyxiating herself.

*The Death of A.I.:* On May 20, 2009, at approximately 4:45 a.m., A.I., a 34-year-old male, was found by a correctional officer hanging from a ceiling light fixture by a bed sheet. A.I. was subsequently transported to the hospital and pronounced dead. A.I. was housed in administrative segregation for most of his confinement due to the high profile nature of his charges.

*The Death of A.J.:* On April 18, 2007, A.J., a 50-year-old male, entered PTDC. The booking and intake screening process identified the prisoner in need of kidney dialysis. Accordingly, this prisoner was housed in a health clinic cell at PTDC. At approximately 12:30 a.m. on August 15, 2007, a corrections officer found A.J. hanging from the cell bars by a bed sheet. The prisoner was transported to the hospital, where he survived until life-support equipment was disconnected eight days later.

*The Death of A.K.:* On July 9, 2007, A.K., a 32-year-old male, entered PTDC. This prisoner was housed in administrative segregation due to the high profile nature of his charges. Less than one month later, on August 5, 2007, a corrections officer found A.K. hanging from the cell bars by a bed sheet. The prisoner was pronounced dead by the Miami-Dade County Fire Rescue Department upon their arrival.

*The Death of A.L.:* On April 26, 2007, A.L., a 23-year-old male, entered PTDC. The prisoner was transferred to MWDC and housed in administrative segregation due to the high profile nature of his charges. On May 27, 2007, a corrections officer found this prisoner hanging from a ceiling grate by a bed sheet. The

- 6 -

prisoner was pronounced dead by the Miami-Dade County Fire Rescue Department upon their arrival.

- *The Death of A.M.:* On August 5, 2006, A.M., a 41-year-old male, entered PTDC. The prisoner was housed in a multiple-occupancy classification cell at PTDC. The following day, August 6, 2006, other prisoners discovered this prisoner hanging from the cell bars by a shoelace. The other prisoners yelled for assistance. A corrections officer arrived but did not have appropriate tools to cut down the prisoner, so he gave a prisoner his personal keys to try to cut him down. Although MDCR policy requires responding corrections officers to initiate cardiopulmonary resuscitation ("CPR"), the prisoner was not administered CPR until nursing staff arrived six minutes later. MDCR's investigation of this suicide revealed that A.M. had expressed suicidal ideation several months earlier and had a history of at least one suicide attempt, neither of which was elicited by MDCR's screening process.

### 1)    Suicide Risk and Mental Health Screening

Incoming prisoners' serious psychiatric needs, including suicidal ideation, go unidentified and unaddressed due to MDCR's deficient intake screening process. Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) ("…Serious medical need is determined by whether a delay in treating the need worsens the condition."); Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (noting a serious medical need is one that is diagnosed by a physician as requiring treatment or obvious to a lay person, as needing medical care); see also Madrid v. Gomez, 889 F.Supp. 1146, 1256-1257 (N.D. Cal. 1995) ("While a functioning sick call system can be effective for physical illnesses, there must be a 'systemic program for screening and evaluating inmates in order to identify those who require mental health treatment.'").

We found the Jail's suicide risk and mental health intake screening to be deficient in several key respects. Significantly, the intake form does not require the intake officer to ask the prisoner if he or she is currently suicidal or has a history of suicidal behavior. Nor does it require the intake officer to solicit input from the transporting officer upon a prisoner's admission to the Jail. The form also does not indicate how many questions must be answered affirmatively in order for the corrections officer to make a referral. In addition to the defects in the form, the screenings are conducted in a large open room in full view and hearing range of other staff and prisoners. The likelihood of obtaining accurate mental health information is seriously compromised by the lack of privacy. Once the intake form is complete, it is placed in the prisoner's booking jacket, rather than being forwarded to staff conducting the second round of screening.

The Jail's second round of intake screening, conducted by either a social worker or a nurse, also omits important inquiries, including whether the prisoner is currently suicidal, had a recent significant loss and/or suicide by family members or close friends. CHS nursing staff who screen and refer prisoners for mental health services also informed us that they do not review the intake screening form completed by the intake corrections officer, thus negating the entire

- 7 -

purpose of the screening by the intake corrections officer.[2]

The efficacy of the second round of screening is also compromised by CHS's failure to retrieve charts or other documentation of prior mental health treatment or suicide attempts from previous incarcerations. Further, social workers at the Jail do not have access to the Jackson Health System computerized records from treatment at Jackson Memorial Hospital, which would provide valuable information about previous mental health treatment and suicide attempts. Communication among medical, mental health, corrections, and transport staff is important because certain signs exhibited by suicidal prisoners can foretell a possible suicide. Staff may be able to prevent a suicide by communicating and acting upon these signs.

There also is a failure to consistently provide screening information to medical and mental health staff via placement of screening forms in the chart, and there is no formal communication between intake screening and classification staff. Without formal communication between screening and classification staff, prisoners with mental illness or at risk of suicide can be placed in housing units that are counter-therapeutic and potentially dangerous, based on the vulnerability of these prisoners. See Estelle, 429 U.S. at 104-05 (prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care).

We observed that certain PTDC housing units appear inherently inappropriate and potentially dangerous for mentally ill or suicidal prisoners because of the types of prisoners housed on the floor (e.g., violent maximum security prisoners), the chaotic atmosphere, the design of the cells (e.g., traditional steel cell bars surrounding the cell), and poor officer visibility into the cells.

        2)    Suicide Risk and Mental Health Assessment, Treatment, and Observation

MDCR fails to properly observe and assess suicidal prisoners. The mental health staff fails to take adequate precautions to ensure that prisoners who have been identified as at risk of suicide are protected. They fail to write orders that specify how closely corrections staff should observe the prisoner and fail to reassess the prisoner daily.

The Jail's observation of suicidal prisoners is deficient in both policy and practice. MDCR's policy fails to clearly describe the types of behavior that should result in a prisoner being placed on observation for suicide. The policy also does not clearly delineate between the types of observation that may be implemented. Instead, MDCR policy has a single observation status: "[l]ine staff will maintain direct continuous observation of suicidal prisoners and document checks at intervals not to exceed every 15 minutes." Although it requires

---

2      Prior to our April 2009 site visit, this screening was done by a licensed practical nurse ("LPN"), who was not trained in identification of mental illness or suicide risk, a common theme that we highlighted during our June 2008 site visit. By the time of our April 2009 site visit, MDCR had started assigning a social worker to complete this screening during ordinary business hours. While this assignment is an improvement, untrained LPNs still conduct the screening after ordinary business hours.

- 8 -

documentation at 15-minute intervals, it appears to require constant observation. In practice, suicidal prisoners are not constantly observed. This is particularly dangerous for the female suicidal prisoners at WDC who are housed in cells that have protrusions that can be used for hanging.

The Jail's clinical assessment of suicidal prisoners also is inadequate. A psychiatrist and social worker share an office, conducting simultaneous interviews with the office door open while other staff enter and exit. Progress notes we reviewed did not document suicide risk assessments or justification for any particular level of observation.[3] In fact, the only indication in a prisoner's chart that the prisoner was on suicide watch was a notation that the prisoner shall "remain on 9-C-1." Such a notation does not constitute a suicide risk assessment. Instead, mental health staff must document the prisoner's current behavior and justify the particular level of observation that is ordered. Furthermore, the Jail does not require development of treatment plans for suicidal prisoners.

The deficiencies of this assessment process are exacerbated by the deficiencies in mental health rounds. Daily psychiatric rounds of the most seriously mentally ill prisoners, housed on the ninth floor of PTDC, are conducted cell-side, in full view and hearing of the other prisoners. These rounds are conducted quickly, often without psychiatric review of prisoners' charts. Although CHS improved its psychiatric rounds by making prisoner charts available to psychiatrists during rounds, our observation revealed that the psychiatrists rarely consult them.

Complicating these deficient assessment, treatment, and observation practices, we observed that prisoner medical charts did not consistently contain a mental health diagnosis for prisoners receiving psychotropic medications. Basic clinical processes require development of a diagnosis in order to treat the mental illness.

For example: A.B. had an initial psychosocial assessment on December 31, 2007. Although A.B.'s chart did not reflect a mental health diagnosis, A.B. continued to receive psychotropic medications for at least six months. Similarly, A.C.'s chart stated that he was receiving psychotropic medications. A.C.'s chart also noted that he was "known" to the mental health team, yet there was no diagnosis. CHS staff informed us that the failure to diagnose has been an ongoing problem.

Although MDCR's Suicide Prevention policy requires that medical staff determine the permitted activities and possessions for prisoners on suicide watch, CHS clinicians informed us that, contrary to policy, the practice is for corrections staff to make these decisions. This practice is inappropriate. For example, MDCR's practice is to require each prisoner placed on the 9-C wing to wear only a safety smock without any underwear, regardless of the specific reason for

---

[3]       We note that TGK does have a standard operating procedure providing that mental health staff conduct assessments of prisoners placed in segregation in a safety cell after 24 hours, 5 days, 30 days, 6 months, and every 6 months thereafter. While we commend MDCR for implementing this procedure and attempting to address the potential for decompensation of a prisoner's mental health status in segregation, it appears from documentation that, in practice, mental health staff merely "see" the prisoners on these intervals without conducting assessments.

- 9 -

the prisoner's assignment to the unit. MDCR and CHS need to have a clinical justification for limiting the property and clothing issued to prisoners. If a prisoner is issued only a safety smock and no underwear, it should be because this is clinically indicated, not because that is the usual practice. Corrections officers should not be making these decisions.

### 3)   Medication Administration

MDCR's procedures for administering psychotropic medications are dangerous. We observed nurses administer psychotropic medications on PTDC's 9-C wing during our April 2009 site visit. The procedure is for one nurse and one corrections officer to walk from cell to cell in the unit with a cart containing drawers of alphabetically arranged paper medication records and medication bottles. Upon arrival at each cell, the corrections officer calls out the prisoner's name. Each cell houses multiple prisoners; however, no process was employed to verify the identity of the prisoner to whom the psychotropic medications were given.

The medication administration procedure lacked appropriate controls. After the corrections officer attempted to identify the prisoner, the nurse flipped through the paper records to try to determine if the prisoner was prescribed medications. She would then pour the medications in a cup for the prisoner. We observed the nurse repeatedly pouring medications back and forth between the medication bottle and the cup, with only an eye account of the actual number of pills to be included. The nurse also had to cut the pills in half on multiple occasions with an ineffective pill cutter that caused fragments of the medications to fall onto the cart, resulting in inaccurate medication dosing.

We observed several prisoners tell the nurse that she was giving them the wrong medication, or dosage, or at the wrong time frame. Six prisoners received no medications, even though these prisoners apparently required an intensive level of mental health services, as they continued to be housed on PTDC's 9-C wing after psychiatric rounds had taken place. For each of these prisoners, the nurse flagged the medication administration record ("MAR") with the reported intent to later return and review the medical record for verification. We concluded that the Jail's medication administration is chaotic, inefficient, and fraught with risk of errors that can cause serious harm to prisoners.

### 4)   Suicide Prevention Training

The Jail fails to provide adequate suicide prevention training to all corrections, medical, and mental health staff. Successful suicide prevention is a collaborative process among all staff; however, training is particularly critical for corrections officers because they are often the only staff who are available 24 hours per day and who have regular contact with prisoners. Pre-service and annual training requirements should be clearly set forth in the relevant policy and should include sufficient topics to ensure that staff are able to recognize the verbal and behavioral signs that indicate a suicide risk, know what to do when a risk is suspected, and understand how to respond when there is a suicide attempt (generally achieved through mock drills).

The eight-hour training program initiated in April 2007 is not mandatory for MDCR staff. Our review of suicide prevention training records as of May 22, 2008, revealed that only

- 10 -

approximately 10% of MDCR's over 2,000 corrections officers had received it. None of CHS's nursing staff had been trained in suicide prevention, even though intake nurses are charged with identifying suicide risk. CHS mental health staff also did not receive any suicide prevention training until May 2008, when a facility psychiatrist provided social workers with a one-hour workshop consisting of seven Power Point slides. Notably, MDCR's suicide prevention policy does not address suicide prevention training requirements.

Even if the Jail's policy appropriately required that all corrections, medical and mental health staff receive adequate initial and annual suicide prevention training, current training staff resources at the Jail are woefully inadequate to complete even just the initial training on a timely basis. As was the case in April 2007 with the inception of MDCR's training, a single training officer is responsible for training all MDCR staff. According to this staff person, it will take approximately six years to complete initial suicide prevention training for all corrections officers, mental health care staff, and nursing staff at the current pace of training and training staff levels. The Jail is unable to adequately train staff with a single training officer. Moreover, training performed by a sole corrections officer omits important instructional input from mental health and medical staff.

MDCR's corrections officers also lack sufficient training in emergency intervention. According to MDCR policy, all corrections officers are required to be certified in first aid, CPR, and the use of an automated external defibrillator ("AED"). Although training records were not available during our June 2008 site visit, MDCR officials informed us that only approximately 75% of corrections officers have actually received the emergency intervention training that is required by policy. The impact of MDCR's failure to follow its own policy of training all corrections officers in emergency intervention is evident in MDCR's inadequate emergency responses to suicides.

        b.     MDCR's segregated housing units for prisoners with serious mental illness and suicidal behaviors are inhumane and unconstitutional.

        1)     The physical conditions are dangerous.

Prison officials have a duty under the Eighth Amendment to ensure "reasonable safety," a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions." Farmer, 511 U.S. at 845 (quoting Helling, 509 U.S. at 33). A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement if he knows that prisoners face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 847 n.9. In addition, elements of the conditions of confinement may establish an Eighth Amendment violation "in combination" even if each would not do so alone if "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." Wilson v. Seiter, 501 U.S. at 304.

The Jail houses male prisoners with serious mental illness and suicidal behaviors on PTDC's segregated ninth floor, 9-C wing. Prisoners on the 9-C wing are locked in their cells nearly 24 hours a day and do not receive recreation, telephone calls, or visitation, unless they are

- 11 -

in one of the five step-down cells on the wing.[4]  Rather than being therapeutic, the 9-C wing is chaotic, crowded, foul-smelling, depressing, and unacceptable for housing prisoners who are mentally ill or suicidal.[5]  It has 19 single-bunk cells for prisoners who are acutely mentally ill or suicidal, and the cells are frequently double or even triple bunked.  In fact, we calculated the rate of overcrowding during one day of our visit, June 10, 2008, to be 62%—greatly exacerbating the already abysmal conditions on the wing.  When these single-person cells house more than one prisoner, as they often do, the second or third prisoner must sleep on the bare floor because there is no additional mattress or bedding.  The floors are often very cold, as the poor circulation of the wing's air-conditioning traps the cold air in the cells causing the temperature in the cells to drop as much as 20 degrees below room temperature.  During our June 2008 site visit, we also observed that, for some of the 9-C wing prisoners who do have a bed, the bedding in some of the cells (e.g., cells 16 and 19) was so old and worn that it could no longer be adequately sanitized and should have been replaced.

Female prisoners who are identified as suicidal are housed in five cells on the 3-C wing of the WDC.  The five cells used for suicidal prisoners at WDC are dangerous because they have many protrusions, including ventilation grates, exposed pipes in the toilet areas, and holes in restraint beds, all of which are potential anchor points for self-asphyxiation.  Moreover, there are several blind spots in these cells, preventing officers from being able to minimize the risk of a suicide by closely observing the prisoner.  In sum, the WDC suicide watch cells provide ample opportunity for the exact outcome that they should be designed to prevent.

Because MDCR staff and prisoners are aware of the horrid conditions on the 9-C wing, staff will threaten, punish, and retaliate against prisoners by transferring them (or threatening to transfer them) to the 9-C wing.  For example, we reviewed an incident report from March 14, 2008, in which a prisoner was kicking his cell door, asking to see a doctor.  After the Jail sent a nurse to see the prisoner, the prisoner continued to kick his door, demanding to see a doctor.  The nurse ordered that the prisoner be placed on suicide precautions and, when the prisoner refused to be handcuffed for transport to the ninth floor, officers sprayed him with oleoresin capsicum agent ("OC spray") and escorted him to the 9-C wing.  We could not find any documentation in this prisoner's file that indicated this prisoner presented a risk of suicide or had acute mental illness.  We spoke with many prisoners who consistently reported being threatened with transfer to the 9-C wing.

The conditions of the PTDC ninth floor mental health unit are not new to MDCR and County officials.  Over the past several years, print and television news media, as well as a non-

---

[4]      At the time of our April 2009 tour, no recreation officer was yet available to provide recreation to the prisoners on the 9-C wing, though a recreation officer was reportedly going to be hired.

[5]      The foul odor of the cells, and to a slightly lesser extent, the rest of the wing, is caused in part by the practice of not providing showers for the more acutely mentally ill or suicidal prisoners.  We observed a garden hose attached to the wall on the 9-C wing which, although not in use during our visit, reportedly has been used to periodically spray prisoners in lieu of showers.

- 12 -

fiction book, have reported on the deplorable conditions of the ninth floor. Also chronicling the ongoing inhumane conditions on the ninth floor, a Miami-Dade County grand jury toured the 9-C wing in 2004 and again in 2008, concluding that "[n]ot much has changed . . . . The setting was not appropriate for treatment then. It is not appropriate now."[6] In February 2009, local state legislators toured the 9-C wing and called it "inhumane . . . a God-awful place."[7]

> 2)   **MDCR fails to provide adequate mental health services or other programming appropriate to the needs of prisoners confined to mental health units.**

Despite the fact that MDCR categorizes the 9-C wing as its housing unit for prisoners who are acutely mentally ill or suicidal, no mental health programming is available to the prisoners confined there. Grossly incompetent or inadequate care can constitute deliberate indifference to the prisoner's needs. Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)). Any individual contact with clinical staff is done cell-side, where clinicians attempt to assess the prisoners' suicidality and mental status by talking to them through the food-tray slot in full view and hearing a range of the other prisoners in the cell and on the wing.

MDCR also does not consistently document a clear rationale explaining why prisoners are housed on the 9-C wing, rather than a less restrictive setting. For example, we reviewed documentation in W.W.'s medical chart indicating that, between April 23 and May 26, 2008, W.W. said he was "alright, ready to be transferred," was "alert, calm, and cooperative," and was "awake, alert, [and had] good eye contact." Yet W.W. remained on the 9-C wing for the entire month despite clinical notations indicating that the 9-C wing was not appropriate for W.W. Other prisoner charts we reviewed contained no rationale for transferring a prisoner from other mental health units to the 9-C wing. For example, X.X. was housed on the 9-C wing during the week of our April 2009 site visit. Yet there was no documentation in his chart supporting the Jail's decision to move X.X. from the 9-B wing—a unit for prisoners with less acute mental illness—to the 9-C wing.

> c.   **MDCR's discipline process fails to account for behaviors that are the product of a mental illness.**

Another critical shortcoming of MDCR's mental health services is MDCR's failure to ensure disciplinary penalties are not imposed on prisoners with mental illness for conduct that is symptomatic of their mental illness. See Thomas v. Bryant, 614 F.3d 1288, 1307-17 (11th Cir. 2010) (holding that repeated chemical sprayings of a mentally ill prisoner constituted cruel and unusual punishment when facility did not evaluate whether the prisoner's conduct was symptomatic of mental illness). Although corrections staff indicated that disciplinary measures

---

[6]   Final Report of the Miami-Dade County Grand Jury, Fall Term 2007, at 27 (Fla. Cir. Ct. August 11, 2008).

[7]   Carol Marbin Miller, Mentally Ill in Jail in a New Crisis, Miami Herald, February 20, 2009, at B1.

- 13 -

are "rarely used" for mentally ill prisoners, our review of records of disciplinary proceedings against mentally ill prisoners revealed that they were routinely subject to discipline for their symptomatic behavior. There is no formal system at the Jail for CHS mental health staff to advise or consult with corrections staff that conduct disciplinary hearings and assign punishment for disciplinary violations. Corrections staff who perform these functions agreed that mental health staff should be formally involved in disciplinary decisions regarding mentally ill prisoners.

2.     MDCR is deliberately indifferent to the serious medical needs of prisoners.

A corrections official's "deliberate indifference" to a prisoner's serious medical needs is a violation of the Eighth and Fourteenth Amendments. Estelle, 429 U.S. at 104; Farrow v. West, 320 F.3d 1235, 1243-46 (11th Cir. 2003); Steele, 87 F.3d at 1269. Jail officials act with deliberate indifference when a prisoner needs serious medical care and the officials knowingly fail or refuse to provide that care. Farrow, 320 F.3d at 1246. The Constitution is violated if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. Providing only cursory care in such a situation amounts to deliberate indifference. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Conditions violate the Constitution if they pose an unreasonable risk of serious damage to a prisoner's current or future health, and the risk is so grave that it offends contemporary standards of decency to expose anyone unwillingly to that risk. Helling, 509 U.S. at 33-36; Chandler v. Crosby 379 F.3d 1278, 1289 (11th Cir. 2004).

MDCR fails to identify and treat prisoners in the Jail who present obvious symptoms of serious illness and injury. When MDCR does identify prisoners in need of medical treatment, the treatment provided is often insufficient, placing the prisoners' health and safety at risk. Prisoners are needlessly suffering and, in some cases dying, due to deliberate indifference. Below we highlight five major areas of deficiencies: correctional medical care intake screening and initial health assessments; access to care for acute medical needs; management of chronic health problems; record keeping; and quality assurance.

a.     MDCR fails to identify timely the acute and chronic care needs of prisoners booked into the Jail.

MDCR's failure to identify the acute and chronic care needs of prisoners entering the jail is clearest with respect to those prisoners who are withdrawing from drugs and alcohol. As a result, prisoners do not receive necessary care, which in turn, can lead to tragic results, as the following examples demonstrate:

- *The Death of E.E.*: On July 19, 2008, E.E. was processed into the Jail and received an intake screening at approximately 1:00 a.m. on July 20. Twelve hours later, E.E. was pronounced dead. The intake screening, completed by a licensed practical nurse ("LPN"), indicated no medical problems or history of drug or alcohol use, and E.E.'s behavior was noted as appropriate. At 5:30 a.m., however, E.E. suffered a seizure. Although an ambulance was called, neither MDCR nor CHS staff authorized E.E.'s transfer to the hospital. A nurse conducted a medical assessment following the seizure and noted E.E.'s blood

- 14 -

pressure to be 203/139.[8]  Despite this high reading, there is no mention of the elevated blood pressure in the comments to the assessment in the prisoner's medical chart.  Additionally, there was no mention of the prisoner being disoriented.  This is noteworthy because a social worker also evaluated E.E. and documented that E.E. appeared lethargic and disoriented.  At 9:30 a.m., MDCR staff transported E.E. to the PTDC ninth floor mental health unit for a mental health evaluation and treatment.  CHS staff did not, however, order treatment for E.E.'s seizure, monitor his blood pressure or other vital signs, or conduct further clinical evaluation.  Approximately three hours later, staff reported finding E.E. unresponsive and transferred him to the hospital, where he was pronounced dead.[9]

*The Death of B.B.:*  B.B. died on May 22, 2008, the same day he entered the Jail. B.B. had a history of drug withdrawal.  Staff reported finding B.B. unresponsive in his cell, and started CPR.  Staff did not, however, use an automated external defibrillator ("AED").[10]  In facilities as large as MDCR, an AED should be available for an emergency situation when a prisoner is without both a pulse and respirations.  More important, despite B.B.'s known history of drug withdrawal, MDCR did not provide an appropriate level of observation and monitoring of B.B.'s condition.

*The Death of A.A.:*  A.A. was admitted to the Jail on April 9, 2008, and died the following day.  A.A. had a history of serious medical problems, including congestive heart failure, hypertension, and heart attack.  At the time of his intake, A.A. was withdrawing from alcohol, and CHS staff placed him on a detoxification program.  However, a detoxification form was not completed, and a physician did not sign the health assessment (indicating that a physician did not review the nurse's assessment findings).  At 8:00 a.m. on April 9, A.A.'s blood pressure was 199/102, and by 10:00 a.m. it was 218/121.  Given A.A.'s medical history and severely elevated blood pressure, A.A. should have been immediately treated by a physician.

*The Death of C.C.:*  On March 6, 2008, MDCR officials processed C.C. into the Jail with a slightly elevated pulse of 111.  C.C. died the next day.  A physician did not sign C.C.'s health assessment on March 6 (indicating that a physician did not review the nurse's assessment findings), and although a nurse referred C.C. to a physician due to the abnormal pulse, there is no documentation of nursing staff conducting follow-up vital sign monitoring.  On the next day, March 7, staff

---

[8]     A normal blood pressure reading is 130/80.

[9]     This letter discusses prisoner deaths but the cause of death is not explained.  MDCR does not maintain autopsy reports, and prisoner deaths are not formally reviewed.  Therefore, the causes of death in the examples provided have not been formally determined.

[10]    An AED is an electronic device designed to deliver an electric shock to a victim of sudden cardiac arrest in order to restore heart rhythms to their normal pace.

- 15 -

found C.C. unresponsive, but did not use an AED as should be expected under the circumstances.

• *The Death of D.D.:* MDCR officials processed D.D. into the Jail on November 6, 2007. D.D. died on November 8, 2007. During the intake screening and initial assessment, CHS staff identified an infection in D.D.'s chest wall, as well as symptoms of drug withdrawal. CHS staff ordered monitoring of vital signs and a follow-up appointment with the physician on November 8. There is, however, no documentation of vital signs monitoring, and the follow-up appointment did not occur. Instead, on November 8, CHS staff reported finding D.D. unresponsive and transferred him to the hospital, where he died.

These prisoner deaths demonstrate that initial screening and health assessments are woefully inadequate. Obvious medical signs and symptoms, such as E.E.'s seizure and disorientation, are often missed by MDCR and CHS staff. Known issues like D.D.'s chest wall infection, or the elevated blood pressures of E.E. and A.A., or the history of drug and alcohol use by B.B., D.D., and A.A., are not sufficiently addressed.

Screenings and health assessments must be timely and thorough, and completed by competent professionals with the necessary training to identify signs that pose risks to prisoners' health. Just as important, correctional facilities must have quality assurance systems in place to ensure accountability for errors that lead to grievous harm. See Helling, 509 U.S. at 35; see also Chandler, 379 F.3d at 1289. MDCR is deliberately indifferent when it routinely provides only cursory care (or no care at all), when the need for more serious medical treatment is obvious at the time of the incident, and then made plain by the resulting harm. Farmer, 511 U.S. at 837.

      b.    **MDCR fails to act on known medical problems discovered through its "sick-call" process.**

MDCR prisoners can request medical treatment through sick-call. Despite its knowledge of sick-call complaints, the Jail fails to take timely and necessary action. This failure to act is unconstitutional deliberate indifference to prisoners' serious medical needs. Estelle, 429 U.S. at 104.

CHS nursing staff triage sick-call complaints during routine medication administration. These brief cell-side interactions do not allow for adequate assessment or medication administration. Prisoners are denied privacy, as the assessment is done with other prisoners standing in line for medication, well within hearing distance.

Nurses do not employ protocols or assessment forms during the sick-call triage. We observed nurses routinely failing to take and record vital signs. Vital signs should be a part of every medical clinical encounter and must be recorded in the medical record. In addition to these concerns, we found evidence that prisoners had to make several sick-call requests before a nurse would initially evaluate them, and then prisoners would endure extensive delays before seeing a physician after a nurse's referral.

Through CHS's sick-call process, CHS is made aware of prisoners' serious medical needs. Yet, CHS repeatedly fails to provide the necessary level of care. This situation amounts

- 16 -

to deliberate indifference resulting in grievous harm, as the following examples demonstrate:

- *The Death of F.F.*: F.F., a 48-year-old male with hypertension, died on January 5, 2008, two months after being admitted to the Jail. On January 2, 2008, F.F. complained to a CHS nurse of chest and gas pain. A complaint of gas pain must be evaluated carefully and fully in a prisoner with hypertension due to the risk for heart disease, as gas can mimic heart disease symptoms. The following day, a physician ordered tests to rule out heart disease. F.F. was supposed to see the physician again the next day, but did not, for reasons unknown. Instead, he was seen by a nurse who administered an antacid. No nursing protocols were used during the exam. The content of both nurse exams exceeded the scope of the nurses' qualifications. On January 5, 2008, F.F. was brought to the medical clinic unresponsive.

- *The Death of G.G.*: G.G. died on October 23, 2007. The day before his death, a CHS nurse evaluated G.G. for complaints of shortness of breath. The nurse's exam was inadequate and incomplete. During the exam, no vital signs were taken, no lung exam was completed, and G.G. was only given medication for a cold. The following day, G.G. made the same complaint and was taken to the hospital, where he died.

F.F.'s chest pain and G.G.'s shortness of breath were serious medical symptoms brought to the attention of MDCR and CHS staff. Disregarding the excessive risks to the prisoners' health and safety, MDCR failed to provide an appropriate level of care.

c.    MDCR fails to provide adequate care to prisoners with serious chronic medical needs.

The Jail is deliberately indifferent to prisoners' serious medical needs when it fails to identify or adequately treat a prisoner's serious chronic illness. *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) (noting that an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate). *See also Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994) ("Knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference.").

The systemic nature of MDCR's deliberate indifference is evidenced by the Jail's failure to operate a functional chronic care program. Prisoners who suffer from chronic medical illnesses must be regularly monitored by qualified medical professionals to prevent the progression of their illnesses. Monitoring should occur on a regular basis to ensure that symptoms are under control and that medications are appropriate. Morbidity and mortality rates of prisoners with chronic illnesses can be reduced with regular monitoring.

The Jail does not track prisoners with chronic illness nor monitor their conditions. Chronic care programs in correctional settings are critical to avoid placing prisoners with serious medical needs at excessive risk. The requirements of chronic care are addressed in guidelines

- 17 -

developed by the National Commission on Correctional Health Care ("NCCHC").[11]  While the Jail claimed to be following the NCCHC guidelines, our review of prisoner charts revealed that no chronic care program exists.  For example, we found prisoners with HIV without any medication.  We also found prisoners with diabetes and hypertension who were without expected tests in order to assess the status of their kidneys, cholesterol level, or heart functions.  And, prisoners with histories of seizures were not monitored closely to determine the level of their seizure medication, which is necessary, as incorrect dosages above necessary levels can cause serious side-effects, such as brain and heart damage.

In addition, a critical component of a chronic care program is appropriate and timely referrals to medical specialists.  MDCR acknowledged delays in consultations for specialty services such as cardiology, neurology, and HIV-related services.  The Ancata court stated that "deliberate indifference to serious medical needs is shown when prison officials have prevented a prisoner from receiving recommended treatment or when a prisoner is denied access to medical personnel capable of evaluating the need for treatment."  Ancata, 769 F.2d at 704 (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).

Our review of medical charts and interviews with CHS staff revealed that HIV-positive prisoners may wait up to six weeks for a specialist referral, and that other chronic conditions can take even longer.  For example:

- *HIV Consult*:  S.S. had an HIV-related referral ordered four weeks prior to our tour, but no response or report had been given about an appointment date.

- *Neurology Consult*:  O.O. had a neurology consult ordered five months prior to our tour, but no response or report was present in the medical record.

- *Cardiology Consults*:  P.P. had a cardiology consult ordered nearly five months prior to our tour, but no response or report was present in the medical record. R.R. had problems with chest pains and had a cardiology consult ordered six weeks prior to our tour, but no response or report was present in the medical record.

- *Gynecology Consult*:  Q.Q. had a history of cervical cancer, and had a gynecology consult ordered seven weeks prior to our tour, but no response or report was present in the medical record.

There is no tracking system for outstanding consultation referrals.  It is necessary to track this information, as prisoners with chronic conditions require a higher level of medical care than is often available on-site, making them more vulnerable to harm.  This deficiency constitutes deliberate indifference.  Ancata, 769 F.2d at 704.

---

[11]     It should be noted that in 2008, NCCHC elevated the requirement of a chronic care program from "important" to "essential," emphasizing the necessity of a functional chronic care program.

- 18 -

    **d.**    **MDCR's poor record keeping practices contribute to the pattern or practice of deliberate indifference to provide adequate medical services.**

MDCR fails to keep complete, accurate, readily accessible, and systematically organized medical records. A complete and adequate medical records system is critical to ensure that medical staff members are able to provide care. Inaccurate or incomplete record keeping places prisoners at excessive risk of serious harm.

The documentation of medical information for MDCR prisoners is done in part through a paper-based system, and in part through an electronic system maintained by the Jackson Health System. The CHS physicians have access to the electronic system to check laboratory data and consultation reports, but the CHS physicians cannot enter data into the system. Instead, CHS maintains a paper chart at the Jail. The current system requires physicians to use both the paper charts and the electronic system to access complete medical information about a prisoner. Moreover, other CHS health care staff, including nurses, do not have access to the electronic system at all; thus, laboratory data in the electronic system is not readily available to CHS non-physician medical staff.

Medical charts often contain an incomplete medical history; fail to document specialist appointments; do not include the medical staff member's name and title attached to notes; and are illegible. Moreover, the Jail's medical records fail to consistently record vital signs during clinical encounters. As noted above, vital signs should be part of every clinical encounter and must be recorded in the medical record.

In addition and contrary to MDCR policy, many charts do not contain the nursing intake screening or the booking officer screening. Thus, medical and mental health staff members do not have information from a prisoner's previous incarceration and often do not have information from the intake screening for the prisoner's current incarceration. Even when the current nursing intake screening is on file, MDCR relies on self-reporting by the prisoner without the benefit of review of prior treatment at the Jail.

**B.**    **MDCR IS ENGAGED IN A PATTERN OR PRACTICE OF USING EXCESSIVE FORCE AGAINST PRISONERS.**

The Eighth Amendment protection from cruel and unusual punishment forbids the use of excessive physical force against prisoners. Hudson v. McMillian, 503 U.S. 1, 5-7 (1992); Skrtich v. Thornton, 280 F.3d 1295, 1300-01 (11th Cir. 2002). As the Due Process Clause of the Fourteenth Amendment affords at least the same Eighth Amendment protection from cruel and unusual punishment to a prisoner of a jail incarcerated prior to trial as it would to a convicted prisoner, City of Revere, 463 U.S. at 244, jail officials will violate the Constitution if they use excessive force on jail prisoners. MDCR correctional officers routinely use excessive force against Jail prisoners in violation of the Constitution.

- 19 -

The use of force by a corrections officer violates the Constitution when it is not applied "in a good-faith effort to maintain or restore discipline," but instead is administered "maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6-7; Campbell v. Sikes, 169 F.3d at 1374; Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996). Courts may examine a variety of factors in determining whether the force used was excessive, most commonly including: (1) the need for the application of force; (2) the relationship between the need for force and the amount of force applied; (3) the threat, if any, reasonably perceived by responsible corrections officers; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the prisoner's injury. Hudson, 503 U.S. at 7-8; Campbell, 169 F.3d at 1375; Harris, 97 F.3d at 505.

Our investigation included an intensive examination of MDCR use of force policies, training, and incident reports. We also conducted many staff and prisoner interviews on this issue. In some cases, our findings of excessive or inappropriate uses of force are in accord with the conclusions from MDCR's own Internal Affairs Unit investigations.

MDCR corrections officers openly engage in abusive and retaliatory conduct, which frequently results in injuries to prisoners. In particular, there is a disturbing and distinct trend of MDCR corrections officers reacting to low level aggression from prisoners (e.g., abusive language or passive resistance to an order) by slapping or punching the prisoner in the head and verbally provoking the prisoner to physically respond. MDCR corrections officers often do not attempt any de-escalation techniques to combat low level aggression before engaging the prisoner in such an inappropriate manner.

Further, MDCR corrections officers frequently employ OC spray under circumstances that do not require such a level of force. Disturbingly, during our interviews with MDCR corrections officers, most officers could not articulate when the use of OC spray was appropriate. Only a few officers were able to competently discuss MDCR policy and explain the use of OC spray as a last resort before using physical force to restrain a resistive, violent, or combative prisoner. When asked, most officers were unfamiliar with the policy or guessed at responses, offering incomplete answers such as "when the prisoner doesn't listen to you." Well-trained corrections officers should be able to articulate clearly and without hesitation the level of prisoner resistance necessitating the deployment of OC spray—or any other use of force—as an appropriate response to restore and maintain order.

The following examples, some derived from MDCR's own internal documents and investigations, illustrate the pattern or practice of using excessive force:

- *Prolonged Fist Fight*: On August 27, 2007, nine MDCR corrections officers, including a Field Training Officer, allowed prisoner A.N. and an officer to engage in a prolonged fist fight at the MWDC. None of the officers involved filed a use of force report. MDCR investigators discovered a video of the fight while investigating a separate incident. The video shows A.N. instigating a fight with an officer, and the officer responding by spraying A.N. with OC spray. A second officer kept other prisoners at arm's length while the prisoner and the officer then engaged in a fist fight. Over a matter of minutes, up to nine other officers responded but failed to intervene in the fight.

- 20 -

- *Physical Assault*: On August 23, 2007, prisoner A.O. rendered a sworn statement to MDCR investigators alleging that a MDCR corporal in MWDC physically assaulted him by slapping him in the face several times, punching him in the right side of his face and his right eye, pushing him to the ground and kicking his face and body. A.O. reported that other corrections officers were present during the assault. A.O. explained that as the assault took place, he attempted to run toward the view of the security cameras, but was dragged back out of view by the officers. A second attempt to run toward the camera view was successful. The corporal caught A.O. at the elevators, however, and choked him and punched him in the side of the face. After reviewing the videotape, which also showed the officer pushing A.O.'s face to the floor while A.O. was restrained in handcuffs, MDCR's Internal Affairs Unit sustained the allegations in part, giving credit only to the acts caught on video, despite A.O.'s injuries corroborating the prisoner's full account. Internal Affairs further noted that several corrections officers, including a supervisor, either failed to report the incident accurately, or did not report the incident at all.

- *Instigating Fights*: In a May 2007 incident at PTDC, prisoner A.P. claimed that a corrections officer ordered him out of his cell and placed him in a visiting booth because the prisoner made derogatory comments about MDCR staff. While in the visiting booth, A.P. claims that an officer asked him if he wanted to fight one of the other officers. A.P. claims he told the officer he did not want to fight. Although the prisoner received a laceration above his eye, no use of force incident report was filed.

- *Striking Restrained Prisoners*: We requested to view videotapes from randomly selected shifts at the different facilities. One of the videotapes from PTDC's ninth floor mental health unit showed a prisoner being dragged to a chair by several MDCR corrections officers and then handcuffed to a table. After being restrained in handcuffs, the video shows an officer punching the side of the prisoner's face. Moments later, another officer arrived to photograph the prisoner's face. It does not appear, however, that any use of force report was filed in regard to this incident.

Interviews with juvenile prisoners housed in the TGK facility revealed a particularly violent atmosphere, often involving the corrections officers directly or indirectly. For example:

- *Violence Against Juveniles*: A videotape of the juvenile unit in May 2008 shows two officers casually engaged in conversation with a prisoner, when one of the officers—unprovoked by any physical movement by the prisoner—grabbed the prisoner and threw him onto a table, and then to the floor. The prisoner struggled to protect himself, while the other officer looked on without taking any action. The prisoner was then escorted to the front of the unit and left locked between two security doors in the hallway leading into the unit.

Contributing to this pattern or practice, use of force reporting in the Jail is frequently inaccurate or incomplete, and in incidents involving multiple officers, not all officers are

- 21 -

submitting individual reports. For example, according to MDCR records, there were 272 use of force incidents in a six-month period from October 2007 through March 2008. Most of the incidents involved physical force or the use of OC spray.[12] MDCR's Internal Affairs Unit, however, independently reported over 1,000 use of force incidents just involving OC spray in 2007. This level of discrepancy in use of force reporting generally, and incidents involving OC spray specifically, indicates a serious issue of under-reporting use of force incidents by MDCR officers.

## C.    MDCR IS DELIBERATELY INDIFFERENT TO SERIOUS RISKS TO PRISONER SAFETY POSED BY PRISONER VIOLENCE.

Prisoners have a constitutional right to be protected from harm. Farmer, 511 U.S. at 832. Corrections officials have a specific duty "to protect prisoners from violence at the hands of other prisoners." Id. at 833 (internal quotation marks and citations omitted). MDCR is violating that constitutional right through its deliberate indifference to the prisoner violence within the Jail. According to MDCR's own reporting of prisoner-on-prisoner assaults, the Jail is experiencing well over a hundred incidents every month.[13] In fact, in a six-month period just prior to our tour, the Jail reported over 300 incidents of prisoner-on-prisoner assaults just in the MWDC facility. In that same six-month period, the Jail reported nearly 250 such incidents in the PTDC facility, and approximately 125 such instances in the Stockade facility.

Not every injury suffered by a prisoner at the hands of another prisoner will violate the Eighth and Fourteenth Amendments to the Constitution. The prisoner invoking the right must demonstrate that, (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm," and (2) corrections officials were "deliberately indifferent" to the risk. Id. at 834. Accordingly, Jail officials must take reasonable steps to protect prisoners from physical violence and to provide humane conditions of confinement. Providing humane conditions requires that a corrections system satisfy prisoners' basic needs, such as their need for safety. A corrections official's failure to supervise prisoners, particularly prisoners known to be violent, may result in unconstitutional conditions of confinement where assaults between prisoners occur due to the lack of supervision. Cottone v. Jenne, 326 F.3d 1352, 1359-60 (11th Cir. 2003) (noting that a lack of monitoring and supervision of known violent inmates, which led to inmate-on-inmate violence, constituted impermissible unconstitutional conduct).

There is a dangerous lack of meaningful supervision in the housing units, particularly the dormitory settings housing maximum security prisoners in PTDC and the Stockade. The

---

[12]    We found that many use of force incidents in the Jail involved the use of OC spray. At the time of our tour, MDCR did not have a uniform system in place throughout the facilities to measure (by weight) OC spray canisters following deployment by a corrections officer (or on an otherwise regular basis) to ensure that the reported use was consistent with the contents of the container.

[13]    Nationwide, prisoner-on-prisoner assaults are under-reported, as prisoners often fear retaliation from other prisoners as a consequence of reporting such assaults. This trend of under-reporting suggests that the problem within MDCR facilities is even greater than the statistics noted in this letter would indicate.

- 22 -

problems with providing adequate supervision to the units in PTDC and the Stockade stem largely from the antiquated design of these facilities. For example, there are no officers stationed inside the majority of the dormitory housing units in PTDC and the Stockade. Therefore, in order for MDCR corrections officers to view the maximum security prisoners housed in most PTDC units, the officers must either enter the unit or walk along a narrow catwalk that runs behind the unit. The catwalk in PTDC is not designed for patrol and does not provide access into the unit should the officer observe an incident that calls for immediate response. MDCR corrections officers patrol the units regularly, but prisoners are aware of the patrol schedule and know when they are, and are not, being directly supervised. A similar situation exists in the Stockade. Most units in the Stockade, including those housing maximum security prisoners, are dormitory settings without a corrections officer present in the unit. Instead, officers patrol outside the several units. Due to the structure of the units in the Stockade, however, officers patrolling outside the units cannot effectively observe the prisoners without actually entering the units to conduct direct observation. As a result, during the time the officer is inside a particular unit conducting direct observation, the remaining units are unsupervised.

Supervision problems also persist in the two units housing male juveniles in TGK. The male juvenile prisoners (those prisoners under the age of 18 years, but being criminally charged as adults under Florida state law) are housed on the second floor of TGK. The juvenile housing units are not equipped to adequately separate the juveniles according to their classification status, resulting in juveniles of mixed security levels being housed in the same unit. The units are often overcrowded, exacerbating security concerns by increasing the number of mixed classification prisoners housed in close proximity, and decreasing the ratio of officers to prisoners. While corrections officers are posted inside the unit, there are blind spots throughout the unit that pose a danger to officers and prisoners when only a single officer is stationed within the unit.

Juvenile prisoners selected as "trustees" are often involved in the incidents of violence. Trustees assist in the jail operations by cleaning the unit and delivering food trays and hygiene supplies. The Trustee program is dangerous and contributes to unconstitutional conditions. First, Trustees reportedly withhold food and hygiene supplies from other prisoners creating a high risk of conflict. Second, we observed trustees being allowed free movement through the unit, including secure areas, when not working, even in nighttime hours. Surveillance videotapes revealed juvenile prisoners often walking behind the control panel that electronically locks and unlocks the individual cell doors. Reportedly, the prisoners on videotape were "trustees" and would do this to retrieve cleaning or hygiene supplies, such as toilet paper. Regardless of the reason, it is extremely dangerous to allow prisoners to have this type of access to the unit's control panel. Third, trustees are reportedly selected based on their ability to physically control the other juvenile prisoners. Juvenile prisoners reported that trustees are often asked by the corrections officers to physically discipline other prisoners.

We interviewed many of the juvenile prisoners, most of whom said they did not feel safe in the unit. Most of the juvenile prisoners we interviewed spoke about the practice of "taxing," an unauthorized and undocumented method of discipline in which corrections officers will lock down a juvenile prisoner in his cell for rule violations and force another prisoner (or prisoners) to inflict physical punishment on the locked-down prisoner. The juveniles reported that a "tax" also can result in extended lockdowns, sometimes lasting up to three days.

- 23 -

In addition, there is evidence that the Jail fails to take reasonable measures to protect prisoners from sexual assault. The August 2010 national survey on sexual victimization in jails and prisons conducted by the Department of Justice's Bureau of Justice Statistics found a high prevalence of sexual victimization at the Miami-Dade County PTDC.[14] In this report, the Miami-Dade County PTDC ranks among one of the worst jails in the country with a high rate of prisoner-on-prisoner rape and sexual abuses in the facility. The national rate for jails is 1.5% and the PTDC had an alarming rate of 5.5%.[15] The Office of Justice Programs of the Department of Justice notified MDCR that it is required to appear for a Prison Rape Elimination Act hearing in Washington, DC on September 15-16, 2011.[16] We intend to monitor the results of the hearing and any related matters of sexual victimization at MDCR.

D.     DANGEROUS AND UNSANITARY CONDITIONS EXPOSE PRISONERS UNWILLINGLY TO AN UNREASONABLE RISK OF HARM.

The Eighth Amendment guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). As the Due Process Clause of the Fourteenth Amendment affords at least the same Eighth Amendment protection from cruel and unusual punishment to a prisoner of a jail incarcerated prior to trial, as it would to a convicted prisoner, City of Revere, 463 U.S. at 244, MDCR jail officials may not deprive prisoners of the minimal civilized measures of life's necessities. Accordingly, MDCR officials must provide, among other necessities, "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)." Chandler v. Baird, 926 F.2d 1057, 1065 (11th Cir. 1991) (citations omitted). Conditions violate the Constitution when they pose an unreasonable risk of serious damage to a prisoner's current or future health, and the risk is so grave that it offends contemporary standards of decency to expose anyone unwillingly to that risk. Helling, 509 U.S. at 33-35; Crosby, 379 F.3d at 1289.

The Miami-Dade County Jail is failing to ensure that sanitation and environmental health conditions are consistent with constitutional standards. Simply stated, conditions within the Jail are unsuitable for detention housing, posing unreasonable risks of serious harm to prisoners' health and safety. In particular, our investigation revealed deficiencies in the following areas: (1) fire and life safety; (2) housekeeping; (3) hygiene and infection control; and (4) chemical control.

    1.     The inadequate fire and life safety systems of the Jail pose an unreasonable risk of harm to prisoners.

MDCR fails to ensure adequate fire and life safety systems throughout the Jail, particularly in PTDC. We observed numerous deficiencies during our tour that endanger the life and safety of prisoners and staff. In the event of a fire, there are several areas of the Jail where

---

[14]     U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-2009, http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=2202 (August 2010).

[15]     Id.

[16]     Prison Rape Elimination Act of 2003, P.L. 108-79.

- 24 -

the sprinkler system would not activate or function properly because sprinkler heads were painted over or otherwise damaged. The lack of an operational sprinkler system greatly increases the risk of injury and death in a fire. For example: In PTDC East Wing Cell 2, all six sprinkler heads were non-functional because they had been recently painted over. In PTDC East Wing Cell 1, none of the sprinklers were operable because of paint coverings, parts missing, or cloth ropes tied to them. On PTDC's third, fifth, and seventh floors, sprinkler heads were covered with paint, or found to be inoperable for other reasons.

More fires occur in the laundry area of jails than in any other part of corrections facilities, and in PTDC, we observed a clothes dryer with no lint filter, resulting in a heavy lint accumulation behind the machine. In TGK, we observed a clothes dryer with a detached vent hose, blowing lint out behind and under the machine. Dryer lint is highly flammable and can cause a fire to spread rapidly.

In the event of a serious fire that requires an evacuation of prisoners from the facility, it is critical that the evacuation is conducted quickly, before toxic fumes begin to develop at the fire site. Therefore, in a jail setting, staff should be able to quickly access emergency keys that will unlock all doors along an evacuation route, including the final exit door to the outside of the building. Keys must be marked so as to be identifiable by sight and touch. However, within the Jail:

- *Inadequate Emergency Evacuation Key*: In WDC, we observed a corrections officer having difficulty locating the correct key to open the locked box containing the emergency evacuation key. When the officer did produce the key, it was not marked for identification by sight and touch.

- *Inadequate Emergency Evacuation Routes*: In PTDC, the evacuation route leads prisoners to the small enclosed recreation yard, but there is no access to the outside of the recreation yard away from the facility. Instead, an officer must unlock the recreation yard from the outside during an evacuation. This procedure creates an unacceptable risk of injury and death to prisoners and staff. In addition, several of the exit signs in PTDC were not properly marked and labeled.

When MDCR corrections officers working in control booths were asked about fire safety equipment such as the self-contained breathing apparatus ("SCBA"), on at least two occasions, the officers could not demonstrate how to properly determine air pressure in the SCBA, even though such tasks are required at the beginning and end of each shift by policy, and are supposed to be documented in log books. Our observations reveal that training is inadequate; log book documentation is of questionable veracity; and the officers are endangering prisoners (and themselves) by their lack of knowledge.

2.    The sanitation within the Jail is not reasonably adequate to provide minimal civilized standards of life's necessities.

The level of cleanliness at the Jail is poor. While some facilities, such as WDC, are generally clean, other facilities are deplorable. During our site visit, the medical clinic area in MWDC was dangerously dirty. Bags of biohazardous materials and trash were stored in

- 25 -

hallways unsecured and unattended. The isolation cells in the clinic were filthy. One cell contained a bloody sheet that had not been removed from the bed. The floor behind the bed in the unit had a heavy accumulation of dirt, paper, and other debris. The other cell in the clinic contained a toilet that obviously had been continually used for some time despite a flushing malfunction.

PTDC, a nearly 50-year-old facility with structural deficiencies, such as cracked concrete and rusting metal, is difficult, if not impossible, to adequately clean. This is a serious issue because such surfaces collect dirt, dust, and debris which lead to bacterial growth, particularly in shower areas. Similarly, the age and condition of the Stockade make it difficult, if not impossible, to adequately clean. The construction of the Stockade includes concrete surfaces that cannot be adequately cleaned by normal cleaning methods, and the window openings are sealed with metal grating too small for normal cleaning equipment. As a result, dirt and grime build up on these sills and are carried into the unit on air currents. The Stockade units are said to be cleaned twice a year with a pressure washer, but the condition of the units we observed suggests that the power washing is ineffective or too infrequent.

In addition, the Stockade is infested with ants and rodents. Poor housekeeping contributes to the presence of these pests, which increases the risk of harm to the prisoners' health. We observed signs of insects and rodents throughout the facilities, including a heavy infestation of drain flies in shower and floor drains, particularly in TGK. Floor drains and shower drains throughout the facility had heavy accumulations of debris and organic matter, which serve as a food source and breeding site for drain flies. Outbreaks of adult flies have been associated with bronchial asthma in susceptible individuals. Their presence is a sign of inadequate housekeeping and sanitation.

TGK housekeeping also falls below constitutional standards. The TGK medical clinic was in need of immediate cleaning. We observed an ice machine in TGK with mold growth in the ice bin and an unapproved ice scoop made from a plastic jug lying on the ice. Molds and bacteria can thrive in the cold temperatures of an ice machine; therefore such machines should be emptied and cleaned regularly to prevent illness to those prisoners and staff consuming the ice.

In addition, improper storage, labeling, and use of cleaning chemicals in a corrections facility can lead to injuries to prisoners (as well as staff). During our tour, we observed unsafe and insecure storage of cleaning chemicals and spray bottles. Additionally, bulk containers were mislabeled or not labeled at all.

3.  Hygiene and infection control are inadequate in the Jail, subjecting prisoners to an unreasonable risk of harm.

Communicable diseases may spread in areas where there is close skin-to-skin contact and where personal hygiene is compromised. Overcrowding in corrections facilities will compromise personal hygiene efforts due to the limited numbers of facility showers and sinks, and overburdened services such as laundry, maintenance, and food preparation. We observed overcrowding and the associated problems of personal hygiene.

- 26 -

- *MWDC Overcrowding*: MWDC, the newest of the five MDCR facilities, has a working capacity for 2,234 prisoners. MWDC was averaging approximately 2,700 prisoners at the time of our tour on June 9-13, 2008. The exact population on the day we toured MWDC was 2,691 prisoners. On that day, one entire unit was closed for shower repairs, further exacerbating the crowding issue.

- *PTDC Overcrowding*: In PTDC's 9-C wing, the mental health unit was over-populated by 62% during our tour on June 9-13, 2008.

In addition to overcrowding, improper attention to personal hygiene and biohazards are a major cause of the spread of diseases and infections in health care settings. We observed several medical exam rooms with no hand washing sinks or hand sanitizer dispensers on the wall. In addition:

- *Nonfunctional Negative Pressure Rooms*: The TGK medical unit contains six negative pressure rooms used for prisoners with serious respiratory diseases, such as tuberculosis. The negative air pressure in such rooms prevents aerosolized pathogens from escaping the patient's room into the hallway and other areas. Only one room was occupied, and when we tested the air pressure, it contained positive air pressure.

- *Unsecure Sharps*: In various medical clinics throughout the Jail, we observed containers for needles and other sharp objects ("sharps containers") not securely mounted or protected. In many cases, the containers are kept on the floor under desks or tables where they could be easily knocked over.

Further, proper maintenance of mattresses plays an important role in preventing the spread of diseases and infections in a corrections setting. Mattresses that are damaged or worn beyond their ability to be properly disinfected should be discarded. We observed dozens of mattresses in use or waiting to be issued to prisoners that should have been discarded.

Similar to the inadequate mattress maintenance, MDCR laundry procedures fail to protect prisoners from the risk of contagious diseases and infections. The laundry operation of the Jail consists of several laundry areas at each facility. There are no uniform policies, however, and the procedures, machines, chemicals, and schedules differ in each MDCR facility. Some MDCR facilities are employing domestic grade washers and dryers that not suitable for institutional use.

We observed that blankets were not washed for months at a time, and that most prisoner uniforms were washed once a week at best, but many prisoners went longer without clean clothing. This practice is unhygienic and can contribute to the spread of disease. Moreover, as a result of these laundering practices, prisoners at the Jail resort to washing their clothes in sinks and showers and hang the clothes on lines to dry. Such clothes lines create security and fire risks within correctional settings.

- 27 -

## V. REMEDIAL MEASURES

As stated above, MDCR is deliberately indifferent to the constitutional deficiencies of its facilities and is engaging in the use of excessive force against Jail prisoners. We believe that the deficiencies discussed in this letter are directly tied to current operational standards which grossly fall below what is required by generally accepted correctional standards. The following remedial measures should be immediately implemented by MDCR to correct the constitutional deprivations outlined above. The remedial measures below are consistent with generally accepted correctional standards. We believe that adopting the following measures will remedy the constitutional deficiencies found in medical care, mental health care, prisoner violence, sanitation and environmental health, and the use of excessive force.

### A.   MENTAL HEALTH CARE AND SUICIDE PREVENTION

#### 1.   Suicide Prevention

Generally accepted professional standards of correctional mental health care mandate the development of a suicide prevention policy, including evaluation by a psychiatrist and development of a management plan. These standards require eight critical components of a suicide prevention policy: staff training, identification/screening, communication, housing, levels of observation/assessment, intervention, reporting, and follow-up/morbidity-mortality review.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Require corrections intake screening to include a specific inquiry from transporting officer regarding whether the incoming prisoner's behavior indicates that he/she is at risk of suicide.

- Cease denial of property and privileges to acutely mentally ill and suicidal prisoners unless clinically indicated.

- Ensure that adequate pre-service and annual in-service suicide prevention training is mandatory for all corrections officers, medical, and mental health staff. Ensure an adequate number of corrections, medical, and mental health staff to conduct multidisciplinary pre-service and annual in-service suicide prevention training and a system of prioritization for attendance in training classes.

- Provide a curriculum for pre-service and annual in-service suicide prevention training that includes an array of topics and mock drills, sufficient for staff to be adequately trained to identify and manage suicide risk.

- Ensure that decisions regarding clothing, bedding, and other property given to suicidal prisoners are made by clinical staff on a case-by-case basis.

- Ensure that each suicidal prisoner has a bed and does not have to sleep on the

- 28 -

floor.

- Provide quality private suicide risk assessments of suicidal prisoners on a daily basis.

- Ensure that staff does not retaliate against prisoners by sending them to suicide watch cells.  Ensure that prisoners placed in suicide watch cells are appropriately placed there based on sound suicide risk assessments.

- Clarify MDCR's policy regarding levels of observation of suicidal prisoners (e.g., constant observation, 15-minute intervals checks, etc.) and ensure that corrections officers implement documented appropriate levels of observation.

- Implement treatment plans for suicidal prisoners that identify signs, symptoms, and preventive measures for suicide risk.

- Require adequate emergency intervention training for all staff that regularly interact with prisoners.  Enforce a policy requiring corrections officers to initiate CPR if they are the first responders to suicide attempts.

- Ensure that cutdown tools are readily available to staff who may be first responders to suicide attempts.

- Conduct adequate multidisciplinary morbidity-mortality reviews of all suicides and serious suicide attempts (i.e., suicide attempts requiring hospitalization).  A preliminary review should occur within 30 days of the incident, and a comprehensive review should occur within 30 days of the completion of a coroner's report.

2.    Mental Health Care Treatment

Mental health treatment should comport with constitutional requirements and generally accepted standards of care to aid in classification, identification of emergent mental health care needs, provision of continuous care, and management of medication.  An adequate correctional mental health system will commonly include the following:  crisis intervention program, acute care program, chronic care program/special needs unit, outpatient treatment services, consultation services, discharge/transfer planning, therapy services, and dedicated rounds by mental health professionals.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Revise intake procedures and forms to adequately screen incoming prisoners for mental health issues and ensure timely access to mental health professionals when the prisoner is presenting symptoms requiring such care.

- Incorporate mental health screening results into prisoners' files and implement a

- 29 -

formal communication process between intake and classification staff.

- Ensure that all staff conducting intake screening are trained adequately, including regarding identification and assessment of suicide risk, and are given appropriate tasks and guidance.

- Ensure that intake screening is conducted in a setting that provides the privacy consistent with correctional security and which includes specific inquiry regarding whether an incoming prisoner is currently suicidal or has a history of suicidal behavior.

- Ensure that medical and mental health staff conducting screening incorporate the corrections screening information into their screening process.

- Ensure that all reasonable efforts are made to obtain a prisoner's prior mental health records and that this information, along with all MDCR screenings, is incorporated into prisoners' charts.

- Develop and implement policies and procedures to ensure prisoners with serious mental health needs receive timely treatment as clinically appropriate, in a clinically appropriate setting.

- Ensure crisis services and acute care in an appropriate therapeutic environment, including access to beds in a health care setting for short-term treatment (usually less than ten days) and regular, consistent therapy and counseling.

- Ensure that mental health staff conduct documented in-person assessments of prisoners prior to placement in a special management unit (segregation) and on regular intervals thereafter as is clinically appropriate.

- Ensure an inpatient level of care that is available to all prisoners who need it, including regular, consistent therapy and counseling.

- Provide adequate on-site psychiatry coverage and psychiatry support staff in order to timely address prisoners' serious mental health needs.

- Ensure that psychiatrists provide documented diagnoses of prisoners.

- Implement an adequate scheduling system to ensure that mental health professionals see mentally ill prisoners as clinically appropriate, regardless of whether the prisoner is prescribed psychotropic medications.

- Ensure that adequate psychotherapeutic medication administration is provided.

- Ensure that mental health care staff are able to access prisoner medical records that are up-to-date, accurate, and that contain all clinically appropriate information.

- 30 -

- Implement policies and procedures requiring that mental health staff review mentally ill prisoners' disciplinary charges to ensure that MDCR does not impose a significant disciplinary penalty on mentally ill prisoners for conduct that is symptomatic of the prisoner's mental illness.

- Ensure that MDCR's quality assurance program is adequately maintained to identify and correct deficiencies with the mental health care system.

- Provide outpatient treatment, including regular, consistent therapy and counseling, to general population prisoners who are on the mental health caseload.

- Provide discharge/transfer planning, including services for prisoners in need of further treatment at the time of transfer to another institution or discharge to the community. These services should include the following:

   a)   arranging an appointment with mental health agencies for all prisoners with serious mental illness;

   b)   providing referrals for prisoners with a variety of mental health problems;

   c)   notifying reception centers at state prisons when mentally ill prisoners are going to arrive; and

   d)   arranging with local pharmacies to have prisoners' prescriptions renewed.

3.    Mental Health Care Housing Units

Generally accepted professional standards of correctional mental health care require that correctional facilities provide correctional mental health systems that allow prisoners to leave their cells for recreation, telephone calls, and visitation, unless prisoners are restricted by a physician's written orders.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Provide for appropriate housing for mental health care, including a chronic care and/or special needs unit for prisoners who cannot function in the general population.

- Provide an appropriate housing unit for suicidal prisoners, and allow those prisoners to leave their cells for recreation, showers, and mental health treatment as clinically appropriate.

- Remove suicide hazards from all areas housing suicidal prisoners or place all

- 31 -

suicidal prisoners on constant observation.

## B.    MEDICAL CARE

MDCR should not deny, significantly delay, or intentionally interfere with medical treatment to prisoners.  To the contrary, MDCR should provide adequate medical care to prisoners in need of serious medical attention.

### 1.    Acute Care

Generally accepted correctional medical standards require that incoming prisoners be screened by staff trained to identify and triage serious medical needs, including drug or alcohol withdrawal, communicable diseases, serious acute or chronic illnesses, mental illness, and potential suicide risks.  In particular, screening for symptoms of drug or alcohol withdrawal must begin at the initial intake or booking process.

In addition to the initial intake screening, the initial health assessment of a prisoner is an important aspect of corrections health care.  Adequate and timely health assessments are necessary for the appropriate treatment of those prisoners who present either acute or chronic needs during intake screening.  Generally accepted correctional medical standards require that an initial health assessment be conducted within fourteen (14) days of admission, or sooner when medically necessary.  Initial health assessments also provide a secondary screening process for the identification of serious medical needs, should the intake screening procedure fail to do so.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Ensure that adequate intake screening and health assessments are provided.

- Ensure that intake screening is conducted as soon as possible, no later than 24 hours after prisoners enter the Jail.

- Ensure that prisoners are not transferred from the intake area until an intake screening is completed.

- Ensure that trained medical care providers review on a daily basis the medical screening information of those prisoners whose screening indicates a need for medical care, to provide prisoners timely access to a physician as is clinically appropriate when presenting symptoms requiring medical care, with the physician assessment occurring no later than 14 days after intake.

- Ensure that prisoners' acute and chronic health needs are identified in order to provide adequate medical care.

- Ensure that appropriate drug or alcohol withdrawal screening is conducted for all prisoners immediately upon entering the Jail, and prisoners presenting symptoms of drug or alcohol withdrawal are immediately evaluated by trained medical care

- 32 -

professionals.

- Ensure that appropriate detoxification monitoring is conducted in an appropriate infirmary setting on prisoners identified as withdrawing from drugs or alcohol.

2.    Access to Care

Generally accepted correctional medical standards require that facilities like those operated by MDCR maintain a system to track prisoner requests for medical care, to evaluate whether prisoners are medically assessed in response to their requests, and to identify those prisoners still in need of medical care after the request is made. Moreover, corrections facilities must provide appropriate policies and procedures to guide nursing staff on how to conduct sick-call assessments, and when to refer requests to higher levels of care.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Ensure that the medical request process for prisoners provides prisoners with adequate access to medical care. This process should include logging, tracking, and timely responses by medical staff as clinically appropriate.

- Ensure that trained medical professionals review medical requests on a daily basis.

- Ensure that medical/sick call requests are appropriately triaged based upon the seriousness of the medical issue.

- Provide timely medical appointments and follow-up medical treatment.

- Ensure that prisoners receive treatment that adequately addresses their serious medical needs.

- Ensure that prisoners receive acute care in a timely and appropriate manner.

3.    Chronic Care

Generally accepted standards of correctional medical care require that medical staff identify detainees with chronic conditions such as diabetes, tuberculosis, and heart disease and provide timely treatment for such conditions. Jails should have an assessment process to adequately identify detainees with serious chronic medical conditions. Prisoners who suffer from chronic medical illnesses must be regularly monitored by medical professionals to prevent the progression of their illnesses.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Develop a chronic care program. This program should include the following:

- 33 -

    a)    a process that will identify prisoners who should be enrolled in a chronic care program;

    b)    a roster of prisoners enrolled in the program;

    c)    a schedule of medical visits for each prisoner enrolled in the program;

    d)    a system for determining which diagnostic tests will be required for each chronic condition; and

    e)    record-keeping which includes documentation of laboratory tests and medical orders.

- Ensure that prisoners receive thorough assessments for, and monitoring of, their chronic illnesses.

- Ensure that standard diagnostic tools are employed to administer the appropriate preventative care in a timely manner.

- Adopt and implement appropriate clinical guidelines for chronic diseases such as HIV, hypertension, diabetes, and policies and procedures on, inter alia, timeliness of access to medical care, continuity of medication, infection control, medicine dispensing, intoxication/detoxification, record-keeping, disease prevention, and special needs.

- Ensure that the medical staff is adequately trained to identify prisoners in need of immediate or chronic care, and provide timely treatment or referrals for such prisoners.

- Ensure that prisoners with chronic conditions are routinely seen by a physician as clinically appropriate, to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

4.    Medical Record Keeping

A critical component in providing adequate medical care is a complete, accurate, readily accessible, and systematically organized medical records system. In a correctional setting, inaccurate or incomplete record keeping places prisoners at risk of serious harm.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Ensure that medical records are adequate to assist in providing medical care and managing the medical care needs of prisoners. Medical records must be complete, accurate, legible, readily accessible, and systematically organized.

- 34 -

- Ensure that all clinical encounters and reviews of prisoners are documented in the prisoners' records.

- Ensure that specialty consultations are timely and that any resulting reports are forwarded to medical staff. Specialist recommendations should be implemented in a timely manner or, where deemed inappropriate, a physician should properly document why such recommendations were not followed.

5.    Quality Assurance

Correctional facilities benefit from having an adequate quality assurance process. Quality assurance is a basic component of clinical practice that is consistent with generally accepted correctional medical standards.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Develop and implement an adequate mortality review system.

- Ensure that the Jail's quality assurance system is adequate to identify and correct serious deficiencies with the medical system.

C.    USE OF EXCESSIVE FORCE

Force used should not be disproportionate to the threat posed by the prisoner. Absent exigent circumstances, lesser forms of intervention, such as issuing disciplinary infractions or passive escorts, should be used or considered prior to more serious and forceful interventions.

Our investigation identified a pattern and practice of excessive force employed by MDCR corrections officers against prisoners. In a correctional facility, an effective way to remedy a pattern or practice of use of excessive force is to address the deficiencies in the areas of policies and procedures, training, and accountability. Improvement in these areas will have the most impact on MDCR in reducing uses of excessive force.

1.    Policies and Procedures

Adequate policies and procedures regarding the appropriate use of force are essential to ensuring that prisoners are not unnecessarily injured by corrections officers and corrections officers are not unnecessarily injured engaging with prisoners. The policies should be comprehensive, clear, up-to-date, and reflect current generally accepted correctional standards. We found that while MDCR's use of force policy is generally adequate as written, most officers were unfamiliar with the policy. Well-trained corrections officers should be able to articulate clearly and without hesitation the level of prisoner resistance necessary for any use of force, as an appropriate response to restore and maintain order.

To this end, MDCR should implement the following policy measures to correct the constitutional deprivations:

- 35 -

- Expressly prohibit the use of force as a response to verbal insults or prisoner threats.

- Expressly prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety of the institution, prisoners, or staff, unless corrections officers have attempted a hierarchy of documented nonphysical alternatives.

- Expressly prohibit the use of force as punishment.

- Expressly prohibit the use of punching and slapping to the head, absent exigent circumstances.

- Develop and implement policies and procedures for the effective and accurate maintenance, inventory and assignment of OC spray and other security equipment.

2.   Training

Use of force training is an essential tool for a corrections facility to ensure that officers are employing force in a manner consistent with generally accepted correctional standards, and not engaging in excessive force. Generally accepted correctional standards require that corrections officers receive annual refresher use of force training courses.

To this end, MDCR should implement the following training measures to correct the constitutional deprivations:

- Develop an effective and comprehensive training program in the appropriate use of force.

- Ensure that annual refresher training is provided to all MDCR officers.

- Ensure that staff receive adequate competency-based training in MDCR use of force policies and procedures.

- Ensure that staff receive adequate competency-based training in use of force and defensive tactics.

- Ensure that MDCR Internal Affairs management and staff receive adequate competency-based training in conducting investigations of allegations of excessive force.

- 36 -

### 3.   Accountability

Generally accepted corrections standards require a process of reporting, administrative review, and investigation of each use of force. This process facilitates the determination of several critical questions, including: (1) whether criminal activity has occurred; (2) whether facility procedures have been followed; (3) whether remedial training is necessary; (4) whether review or change in policies is required; and (5) whether the incident is part of a larger trend. We found that MDCR is underreporting incidents and producing use of force reports that are frequently inaccurate or incomplete.

To this end, MDCR should implement the following accountability measures to correct the constitutional deprivations:

- Ensure that staff adequately and promptly (within 24 hours) report all uses of force.

- Ensure that management review of incident reports, use of force reports, and prisoner grievances alleging excessive or inappropriate uses of force includes a timely review of medical records of prisoner injuries as reported by medical professionals.

- Ensure that incident reports, use of force reports and prisoner grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

- Develop and implement an adequate system of tracking and reviewing use of force incidents by MDCR officers. The system should be capable of identifying patterns and trends that can be addressed through training, administrative, or disciplinary measures.

### D.   PRISONER VIOLENCE

Jail officials must take reasonable steps to protect prisoners from physical violence and to provide humane conditions of confinement. Providing humane conditions requires that a corrections system satisfy prisoners' basic needs, such as their need for safety.

To this end, MDCR should implement the following measures to correct the constitutional deprivations:

- Ensure that corrections officer staffing and supervision levels are appropriate to adequately supervise prisoners.

- Ensure frequent, irregularly timed, and documented security rounds by corrections officers inside each housing unit.

- Ensure that staff adequately and promptly report incidents involving prisoner violence.

- 37 -

- Develop a process to track all serious incidents that captures all relevant information, including: location, any injuries, if medical care is provided, primary and secondary staff involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

- Increase video surveillance in critical housing areas and adjust staffing patterns to provide additional direct supervision of housing units.

- Develop and implement appropriate training for corrections staff addressing security administration and providing for proficiency training.

- Develop a plan to reduce and prevent overcrowding, most immediately the triple-bunking of prisoners in cells designed for two prisoners.

- Develop and implement policies and procedures for an appropriate, objective classification system that separates prisoners in housing units by classification levels in order to protect prisoners from unreasonable risk of harm.

E.    FIRE SAFETY AND ENVIRONMENTAL HEALTH

Generally accepted correctional standards require adequate sanitation and environmental health conditions, such as proper fire safety systems, sanitation, and hygienic materials and utilities. In order to cure its pattern or practice of inadequate sanitation and environmental conditions, the Jail should ensure that the facilities' conditions do not pose serious risks to prisoners' health and safety. To that end, MDCR should implement the following measures to correct the constitutional deprivations:

1.    Fire Safety

- Ensure that all facilities have adequate fire and life safety equipment that is properly maintained and inspected.

- Implement competency-based testing for staff regarding fire/emergency procedures. Train and drill staff in use of fire safety equipment.

- Ensure that emergency keys are appropriately marked and consistently stored in a quickly accessible location.

- Ensure that fire alarms and sprinkler systems are installed and adequately maintained in all housing areas.

- Develop and implement policies and procedures for the control of chemicals in the facility, and supervision of prisoners who have access to these chemicals.

- 38 -

2.   Sanitation

- Develop and implement policies and procedures to ensure adequate cleaning and maintenance of the facilities with meaningful inspection processes and documentation. Such policies should include oversight and supervision, as well as establish daily cleaning requirements for toilets, showers, and housing units.

- Ensure prompt and proper maintenance of shower, toilet, and sink units.

- Ensure that medical areas are adequately cleaned and maintained, including negative pressure rooms. Ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

- Ensure proper ventilation and airflow in all cells and housing units.

- Develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials.

- Secure all sharp medical tools.

- Destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. Inspect and replace as often as needed all frayed and cracked mattresses.

- Ensure adequate pest control, including sufficient staffing for routine and follow-up pest control services.

3.   Hygiene

- Ensure that laundry procedures protect prisoners from exposure to contagious disease, bodily fluids, and pathogens. Develop and implement a policy for handling, washing, and drying of laundry. Train staff and educate prisoners regarding laundry sanitation policies.

* * * * * *

- 39 -

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. As a matter of courtesy, we will not post this letter to the website until five calendar days from the date of this letter. We will also provide a copy of this letter to any individual or entity upon request.

We hope to continue working with the County officials in an amicable and cooperative fashion to resolve our outstanding concerns regarding the Miami-Dade County Jail. Since we toured, MDCR has reported that the Jail has adopted a number of improvements, many of which appear to be designed to address issues raised at the conclusion of our site visits. We appreciate the Jail's proactive efforts. Nonetheless, the deficiencies we identified are serious and systemic, and we anticipate that a court-enforceable agreement will be necessary to remedy them.

We are obligated to advise you that, in the event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct the deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them. 42 U.S.C. § 1997b(a)(1).

We would prefer, however, to resolve all matters by working cooperatively with you and are confident that we will be able to do so in this case. The attorneys assigned to this investigation will be contacting the County's attorneys to discuss this matter in further detail. If you have any questions regarding this letter, please contact Jonathan Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:   R.A. Cuevas, Jr.
      County Attorney
      Miami-Dade County

      Robert Duvall
      Assistant County Attorney
      Miami-Dade County

      The Honorable Joe A. Martinez
      Chair, Board of County Commissioners
      Miami-Dade County

- 40 -

Alina T. Hudak
County Manager
Miami-Dade County

Timothy P. Ryan
Director, Corrections and Rehabilitation Department
Miami-Dade County
Tyrone W. Williams, Esq.
Legal Advisor, Corrections and Rehabilitation Department
Miami-Dade County

The Honorable Wifredo A. Ferrer
United States Attorney
Southern District of Florida